United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT ADAMS, JR., STEPHEN JONES, JOHN
CLAY, ROSE BAYLOR, KENNETH RUSSELL, and
ZETTA YARBOROUGH,  et. al.
                        Plaintiffs,

            vs.

PINOLE POINT STEEL COMPANY, MARWAIS
STEEL COMPANY, and COLORSTRIP DIVISION,
                        Defendants.
_____/

No.  C-92-1962 MHP

**FINDINGS OF FACT
AND CONCLUSIONS
OF LAW**

**INTRODUCTION**

        This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§2000e-5, 42 U.S.C. section 1981, and the California Fair Employment and Housing Act ("FEHA"),

Cal. Gov't. Code §12900 et seq., claiming racial discrimination.    A class of African-American

employees of defendants Marwais Steel Company, Pinole Point Steel Company, and Colorstrip

Division, employed at their two plants in Richmond, California, from and after March 28, 1990, was

certified.  The court conducted a bench trial on the hostile work environment claims, the other

claims having been resolved separately.   It is apparent, as will be shown herein, that these claims

are not suitable for adjudication as a class action.  The trial testimony fails to establish that there are

sufficient numbers of class members to satisfy Rule 23 of the Federal Rules of Civil Procedure and

the potential members are or could be readily identifiable. Furthermore, the acts and conduct

testified to were not suffered by all members of the class nor is there evidence of the subjective

measure of the offensive conduct other than by those who testified to their own personal

experiences.  Thus, the court finds that the conduct complained of is not amenable to class action

treatment as explained below.

Also, in earlier proceedings and orders this court looked to the management, administration, policies, human resources practices and employment records in determining whether Marwais and Pinole Point should be treated as one entity and found sufficient evidence at pretrial to so treat them. This may have been appropriate for claims of discriminatory hiring, promotion and termination and for some terms and conditions of employment. However, based upon the testimony at trial regarding hostile work environment, the evidence does not support such treatment. The circumstances, perpetrators and supervisors involved were not the same at both plants. Only two of the employees testified to being subjected to such treatment at both facilities. All of the other employees testifying at trial testified to incidents occurring at only one plant. Furthermore, the nature of harassment and hostile work environment claims requires the showing of specific instances of harassing or hostile activities that permeate the workplace and also the subjective experience of the offended employee. The offending activities do not translate to other workplaces in which the employee has not worked or to which the employee cannot testify. Thus, the court evaluates the extent of the activities in each workplace separately and as experienced by the testifying employee.

For liability purposes the court considers only those activities and conduct after the dates for each of the respective entities as follows: Marwais Steel: June 2, 1990 for the Title VII claims and March 28, 1990 for the section 1981 and FEHA claims; Pinole Point: November 30, 1991 for the Title VII claims and September 24, 1991 for the section 1981 and FEHA claims.

The court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). To the extent that findings of fact are included in the conclusions of law they are deemed  findings of fact and to the extent conclusions of law are included in the findings of fact or this prologue they are deemed conclusions of law.

**FINDINGS OF FACT**

**I. Undisputed Facts**

In preparation for trial the parties submitted the following facts as undisputed and they are adopted by the court. They consist of information about the defendants, their structure, management and operations, and specific incidents that occurred at defendants' facilities.

2

**United States District Court**
For the Northern District of California

**A. Defendants' Structure, Management and Operations**

1. Marwais Steel Company ("MSC") is a California corporation which operated a steel coil processing facility at One Barrett Avenue in Richmond, California until it closed that plant in April 1996.

2. Pinole Point Steel Company ("PPSC") is a California corporation which operates a continuous hot-dip steel galvanizing plant located at 5000 Giant Road in Richmond, California.

3. Colorstrip Division was a division of MSC, and then it became a division of PPSC. It operated a steel paintline operation at the One Barrett Avenue plant until approximately 1992.

4. Peter Wais was the President of PPSC and the Vice-President of MSC at all relevant times.

5. At MSC, during the time that Colorstrip Division was operating, there were three departments in operation at the One Barrett Avenue plant: Processing, Paintline and Maintenance. After the Colorstrip Division paintline was decommissioned, there were two departments: Processing and Maintenance. At MSC, there have been basically two levels of management: Department supervisors (also known as foremen) and Plant Superintendent.

6. At the time the MSC plant closed, there were three job classifications: Material Handler, Slitter Operator, and Electro-Mechanical Repairman. When Colorstrip Division was operating, there were also Specialists, Paintline Operators, and Maintenance Machinists. The classification of "Production Worker" was the predecessor to the classification of "Material Handler."

7. At PPSC, there have been three departments: Galvanizing (Department 41), Shipping and Finishing (Department 42), and Maintenance (Department 43). At PPSC, there have been basically three levels of management: department supervisors (also know as foreman or shift supervisors), department managers, and Plant Manager.

8. The job title "foreman" at Marwais Steel Company, Colorstrip Division and Pinole Point Steel Company is, and has been synonymous with the job title "supervisor."

**B. Specific Incidents**

9. A photograph relating to drug rehabilitation was displayed in th Pinole Point Steel

Company plant in approximately March 1996.  In the photograph, the faces of the group of people were colored in with black marker to depict smiling black faces and the initials of black employees were placed next to the smiling faces.  Defendants investigated this incident and were unable to identify the person or persons responsible therefor.

10.  In approximately May 1992, in a discussion about an NAACP dinner, Galvanizing Line Manager Bill Brady said to named plaintiff Ken Russell words to the effect of "If you don't have a tie, you can wear a rope around your neck."  In response to this incident, defendants' President Peter Wais verbally reprimanded Bill Brady.

11.  Pinole Point Steel Supervisor Cary Felciano said to named plaintiff Ken Russell words to the effect of "Go back to work.  You're not on the plantation no more."

12.  Pinole Point Steel Supervisor Robert Farris said to class member Rodney Nelson words to the effect of "How's it going, Pussycat?"

13.  Marwais Steel employee Brian Charcowicz painted a cantaloupe with a black face. Charcowicz also referred to named plaintiff Stephen Jones as "Buckwheat."  In response to Charcowicz' use of the name "Buckwheat" Plant Superintendent Tom Anderson verbally reprimanded Charcowicz.

## II.  Witnesses

The following persons testified as witnesses at trial:

1.  Robert Adams who is a named plaintiff in this action and who was employed and worked at Marwais from 1981 to the plant closure in March 1996.

2.  Stephen Jones who is a named plaintiff in this action and who was employed and worked at Marwais from 1986 until November 1991.

3.  John Clay who is a named plaintiff and was employed and worked at Marwais from 1977 until the plant closure in March 1996.

4.  Kenneth Russell who is a named plaintiff and was employed and worked at Pinole Point from 1988 through at least the time of trial.

5.  Mustapha Cannon who is African American and was employed and worked at Pinole

4

Point from 1982 until April 1995.

6.  Lee Oscar Cooper Sr. who is African American and was employed and worked at Pinole Point from 1981 through at least the time of trial.

7.  Jerry Robertson who is African American and was employed and worked at Pinole Point from 1986 through at least the time of trial.

8.  Chester Carter who is African American and was employed and worked at Marwais from mid-1991 until 1992 when he transferred to Pinole Point returning to Marwais in 1993 until the plant closure in March 1996.

9.  Ron Jefferson who is African American and was employed and worked at Marwais from 1993 until the plant closure in March 1996.

10. Jack Spicer who is African American and was employed and worked at Pinole Point from July 1992 through at least the time of trial.

11. Marcus Harper who is African American and was employed and worked at Marwais during the summer of 1991 and at Pinole Point during the summer of 1992.

12. Dexter Ballard who is African American and was employed and worked at Pinole Point from 1988 until June 1992.

13. Douglas Aldridge who is a white emloyee and was employed and worked at Marwais from January 1994 until the plant closure in March 1996.

14. Murray (Chuck) Gould who is a white employee and was employed and worked for Marwais from 1980 until the plant closure in March 1996.

15. Leroy (Lee) Matthews who is African American and was employed and worked continuously as a supervisor or foreman at Pinole Point, Colorstrip and/or Marwais at various times throughout the period of 1984 through at least the time of trial.

16. Cary Feliciano who is a supervisor and has been employed and worked at Pinole Point from 1981 through at least the time of trial.

17. Margaret Ramirez who has been the Human Resources Manager for all three defendants from 1990 through at least the time of trial.

United States District Court
For the Northern District of California

18. Stephen Crawford who has served in various supervisor and manager positions for all three defendants at various times since commencing his employment in 1991 through at least the time of trial.

19. Peter Edward Wais who was President of Pinole Point, Vice-President of Marwais and Chief Executive Officer of Colorstrip and served on the Board of Directors of all three defendants at all times relevant in these proceedings.

20. Stephen Brombacher who has been employed at Pinole Point since 1978 and has served as a manager or superintendent of the Maintenance Department and for a short time as the manager of the Shipping Department.

21. Franklin Earl Davis who has been employed at Pinole Point since 1980 and has been a supervisor on the galvanizing line since 1988 and through at least the time of trial with the exception of one year serving in metallurgy in 1990.

22. Robert Farris who has been employed at Pinole Point since 1979 and serving as a foreman or superintendent since 1981 through at least the time of trial with a less than one year stint as a superintendent at Marwais in 1987-1988.

23. Martha Christopher who has been employed and served as Vice-President of Operations for all three defendants since 1994 for so long as the entities were operational.

24. Jeffrey Jaeger who has been regularly employed either at Pinole Point since 1983 or Colorstrip from March 1996 through at least the time of trial with intermittent service at Marwais holding supervisor and foreman positions since 1990.

25. Kenneth Brock Williams who has been employed in various positions at all three of defendants' facilities since commencing with his first job at Pinole Point in 1981 and serving as a supervisor or manager for one or more of the defendants through at least the time of trial.

26. Thomas P. Anderson who served as the General Plant Superintendent for Marwais from April 1988 through September 1992.

27. Mark Hector who was employed and worked as a supervisor or manager at Pinole Point since 1989.

6

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

28. Hugh Barnett who was employed and worked at Pinole Point from December 1987 until June 1993 serving as General Manger of Operations at Pinole Point from the beginning of his employment until the end of 1992.

29. James Gillum who was employed as a supervisor at Marwais in January 1994 until the plant closure in March 1996.

Each of the supervisors or management personnel enumerated at numbers 16 through 29 above are white or are not African American unless otherwise indicated.

### III. Marwais Steel Company

#### A. Racially Offensive Objects: Nooses

1. Stephen Jones testified that between March 1990 and November 1991 he saw a noose hanging from an axe in the paint primer room and a drawing of a noose at the exit end of the paint line. Jones testified at trial that the pictures of nooses were a few inches in height and eventually were removed. Defendants concede this point, although they assert the nooses were "isolated incidents."

2. Jones testified that he complained to Superintendent Anderson about the nooses. Anderson admitted that Jones complained to him about nooses.

3. Doug Aldridge also testified that he saw a noose that was twelve to eighteen inches in height drawn on the wall of the primer room in 1994. The drawing was never removed from the wall during the following two years Aldridge worked at the Marwais plant. Defendants do not deny the presence of the drawing.

4. The testimony on the issue of whether defendants were aware of the nooses was in controversy. Plaintiffs conceded that the primer room was part of a paint line that had been shut down, however, they contended that the primer room was often used by employees as a shortcut to reach the saw house. Aldridge testified that he saw Supervisors Jaeger, Crawford and Gillum walk through the primer room. Supervisors Jaeger and Gillum denied that they had ever seen a drawing of a noose. The court finds that this testimony is not credible in light of the fact that the drawing remained on the wall for a two year period. Moreover, as noted above it was undisputed that

1  Superintendent Anderson was aware of the nooses.  These nooses were, however, in a non-working

2  area of the facility and the frequency of the use of that area is not established.

3      **B. Racially Offensive Objects: Dolls**

4      5.  Stephen Jones testified that in January of 1989 he found three cantaloupes near his work

5  station that were dressed up to appear like caricatures of an African American family.  Defendants

6  do not deny the presence of the cantaloupes. The court may consider these incidents only for the

7  purpose of evaluating the overall culture and environment of the facility and not for liability

8  purposes since they occurred before the liability period.  In view of this limitation the court does not

9  elaborate on the details, disputed and undisputed, that are in the record.

10      6.  It is undisputed that in 1991 Jones wrote a letter to Superintendent Anderson complaining

11  about racial harassment in the plant.  The letter cited the cantaloupe dolls.  Jones testified that he

12  also complained to the Department of Fair Employment and Housing ("DFEH").

13      7.  Throughout the time period 1993-1995 several plaintiffs claim that they saw dolls

14  resembling a caricature of an African American man tied to a forklift with a rope around its neck.

15  The existence of some of these dolls is not in controversy.

16      8.  At trial the court received testimony about two doll incidents which were contested.

17  Robert Adams testified that sometime after 1993 he saw a black doll tied to a forklift.  Adams

18  admitted at trial that the only other employee he told about the doll was the shop steward, Stu

19  Broughton.  Chester Carter testified that sometime after 1993 he saw a dark-colored doll tied to a

20  forklift at the plant.

21      9.  Defendants question Carter's credibility as he testified that he could not describe the doll

22  in detail even though it was approximately five feet away from him.

23      10.  The court finds that there is no evidence that either Adams or any other employee

24  complained to management about the doll in 1993.

25      11.  Ron Jefferson testified that he saw a naked black doll tied to a forklift in early 1994.

26  Jefferson testified that he cut down the doll and took it to Supervisor Jaeger.  Jefferson testified that

27  he also showed the doll to his co-worker Leroy Maestas.

28

United States District Court

For the Northern District of California

12.   Defendants deny that Jefferson ever complained to management about a racially offensive doll.  However, Supervisor Jaeger did not deny that Jefferson found a doll at Marwais.

13.   Jefferson testified that Jaeger told him he would inform Manager of Operations Ken Williams about the doll.  Jefferson further testified that the doll remained on a shelf in the supervisors' office for approximately one month.  There is no evidence that Jaeger conducted any investigation into the existence of the doll.  Nor do defendants put forth any evidence of an investigation by any other party.

14.   Jaeger testified that it was his impression that the doll was not a racial object as he recalled that the doll was caucasian.  However, Jaeger also testified that he "could not recall" whether Jefferson brought him a doll.

15.   John Clay testified that he saw a naked, black-colored doll on a forklift in 1995. Plaintiffs contend the doll was in an area visible to all employees and supervisors.  Defendants do not contest the presence of the doll at the plant.

16.   Clay testified that a co-worker removed the doll and took it to Manager of Operations Ken Williams.  Defendants do not deny that Williams received a doll from an employee.

17.   Supervisor/foreman, Leroy Matthews, who is not a plaintiff in this action and who is African American, testified that he had seen a doll in a trash dumpster which he did not interpret to be an African American doll.  As Matthews' testimony on this point changed from his deposition to trial and on cross-examination during trial the court gives little credit to this testimony.

18.   While the earlier doll incidents recounted by Adams and Carter are ambiguous and uncertain, the court finds that the evidence regarding the later two doll incidents to be credible.

19.   Although defendants contest that Jefferson or Clay ever complained about the dolls, their claim is inconsistent with their defense that the Manager of Operations, Ken Williams, posted a message in the plant indicating that plant management would not tolerate such dolls in the workplace.

20.   Defendants also contend that either Williams or Lead Supervisor Crawford declared at a meeting that the person guilty of bringing the doll to the plant would be fired if discovered.   Thus,

9

1    the court finds that defendants had notice of at least one of the doll incidents.

2          C.  **Racially Offensive Written or Verbal Statements**

3          21.  Robert Adams testified that he saw the letters "KKK" written on slitter machinery from

4    1986 to 1988.  He believed the writing to be visible to any employee in the plant.   Defendants do

5    not contest that Adams saw graffiti containing the letters "KKK" in the plant.

6          22.  Adams testified that he complained about the graffiti to Supervisor Bunker and through a

7    company grievance procedure.  He also testified that he is not aware of anyone investigating his

8    complaints and that the graffiti remained in the plant until he painted over it himself.  Defendants do

9    not contest that Adams complained to management about the graffiti, However, this incident falls

10   outside the liability period

11         23.  It is uncontroverted that Adams saw a paper with the letters "KKK" written on it tacked

12   onto the bulletin board in the Marwais locker room in the summer of 1991.  Adams testified that he

13   told only class member Decagur Wade about the paper on the bulletin board.  Adams did not testify

14   that he told management. Although plaintiffs testified that supervisors regularly passed through the

15   locker room to go to the snack bar, the court finds that there is insufficient evidence to conclude that

16   defendants had notice of this graffiti.

17         24.  Marcus Harper testified that when he worked for Marwais in the summer of 1991, he

18   saw "KKK" written on each of the stalls in one of the plant's bathrooms.  The letters remained on

19   the wall throughout the summer.

20         25.  There is no evidence that Harper complained to management about seeing the racially-

21   offensive graffiti.  The testimony as to whether management was aware of this graffiti is in dispute.

22   Supervisors used these bathrooms along with line employees.

23         26.  Aldridge and  Supervisor Crawford testified that they had never seen racially motivated

24   graffiti in the bathrooms.  Jaeger testified that he did see some graffiti in the bathrooms, but it was

25   not racial in nature.

26         27.  The court concludes that the evidence presented is insufficient to demonstrate that

27   management had knowledge of KKK graffiti in the bathroom during the summer of 1991.

28                                              10

United States District Court
For the Northern District of California

1    28.  Adams testified that in 1990 Supervisor Bunker told Adams to respond to orders by

2    saying "yes, suh."  Adams testified that he refused because he interpreted Bunker's request to be a

3    reference to slavery.  Defendants concede that Bunker asked Adams to call him "sir", however, they

4    contend that there was no evidence of racial animus in this request. [1]

5    29.  Adams testified that he complained about Bunker's request in a grievance meeting.[2]

6    The court finds that even if this incident occurred at a 1990 date within the liability period it is an

7    isolated incident and  insufficient to show racial animus.

8    30.  Adams testified that sometime after March of 1990, co-worker Mike Linton made

9    racially offensive comments to him, including comments about black people being likely to be on

10   welfare and dark skin being like tar.  Defendants concede that Linton made offensive comments to

11   Adams involving Adams' skin looking like tar and Linton's skin being pure.

12   31.  While there is evidence that Adams complained to management about racially offensive

13   pictures in Linton's office, there is no evidence that Adams notified management about Linton's

14   comments or that management was aware of Linton's actions.  Additionally, defendants assert that

15   these comments were isolated incidents.

16   32.  Adams testified that sometime after March of 1990, white co-worker Troy Harr told him

17   he believed in racial segregation and did not support interracial marriage.  Defendants concede that

18   Harr made these statements.  It is uncontroverted that the statements were made in the context of a

19   conversation that Adams initiated about "family, marriage, and community." There is no evidence

20   that Adams complained to management about Harr's statements.  Furthermore, a co-worker's

21   expression of personal beliefs in a give-and-take discussion such as this, without more, is not

22   actionable.

23   33.  Adams testified that in 1994 white employee Doug Whitman told Adams that  "G-d

24   cursed black people."  Whitman made the comment in front of Supervisor Matthews.  Matthews did

25   not discipline Whitman.  While defendant asserts that Adams never told Whitman that he did not

26   want to talk with him about "racial matters", this type of comment is clearly offensive and not

27   merely appurtenant to a discussion about race relations.

28

**United States District Court**
For the Northern District of California

34.  Adams testified that in 1994, during a meeting of day shift employees, Doug Whitman responded to someone's question about paychecks by saying that "the whites could get their checks first.  The blacks, they don't need theirs or they can get it last."  Adams testified that Supervisor Matthews did not address Whitman's remark, even though Matthews had said earlier in the same meeting that racial harassment would not be tolerated at Marwais.  Defendants concede that Whitman made the comment, but allege that it was an isolated comment and thus not actionable.  The court finds, however, that these comments were made in front of supervisors who then took no action.

35.  Adams testified that when he asked Matthews to address the comment, Matthews just shrugged and walked away.  While defendants contend that Adams never complained to management about Doug Whitman or about racially-motivated comments in general,  it is clear from Matthews' statement earlier in the meeting that racial harassment would not be tolerated and defendants were on notice of complaints in general about harassment.

36.  John Clay testified that between 1988 and 1992, Supervisor Bunker repeatedly called him "boy" and "Mandingo."  Clay also testified that Bunker ordered Clay to clean up the workplace, saying "that's all your people are good for, cleaning toilets, washing dishes, and picking cotton."  Defendants conceded at trial that Bunker made the comment about "washing dishes and picking cotton" when he was assigning Clay to clean up.  Clay's trial testimony regarding the use of the word "Mandingo" was called into question as, at his deposition, Clay testified that Bunker did not use the word "Mandingo" referring instead to Clay as a "strong, muscle-built man."

37.  Clay testified that he complained to Superintendent Anderson about Bunker's comments.  Superintendent Anderson testified that Bunker denied calling Clay "boy."  It is uncontested that Anderson never took any action, based on Anderson's perception that Bunker's denials were credible since  Anderson knew Bunker better than he knew Clay. The court finds that Bunker made racially derogatory comments and that management failed to act.

38.  Marcus Harper  testified that when he worked for Marwais in the summer of 1991, Supervisor Wilson made remarks to him about "you people" when referring to African Americans

12

but not to other groups of people.  Harper also testified that Wilson would tell him "even if you people go to college you still can't learn."  Defendants did not contest that this statement occurred.

39.  Harper testified that when he worked for Marwais in the summer of 1991, he heard Supervisor Conyers make offensive remarks, including such characterizations of African American teenagers as "gang bangers, drug addicts and drug dealers" and African American Muslims as "black militant mother fuckers."  Harper also testified that Conyers referred to African Americans as "you people."  Defendants do not contest that Conyers made these remarks.  While these comments are offensive, Harper worked at Marwais only during the summer of 1991, and these remarks did not occur over a sustained period of time.

40.  Stephen Jones testified that early in his employment at Marwais, a supervisor named Joseph called him "Toby" repeatedly.  Defendants contend that two men named Joe worked at Marwais but neither served as a supervisor or member of the management team.  Defendants concede that Jones complained to Superintendent Anderson about being called "Toby" by a supervisor named Joe.  Anderson testified that he investigated all of Jones' complaints and was unable to substantiate any of Jones' claims.  It is questionable whether this occurred within the liability period.  Nonetheless, plaintiff has failed to link up this appellation with any racial animus.

41.  Jones testified that in 1990 and 1991, co-worker Charcowicz called Jones and other African American employees "dumb," "illiterate," and "lazy."  Defendants do not contest this point and the court finds the claim credible.  Moreover, Greenwood, a supervisor at Marwais, testified that he heard Charcowicz call two African American employees "lazy."

42.  Jones testified that from 1987 to 1991, Charcowicz called him "Buckwheat" up to fifteen times a day.  The court finds the frequency testified to questionable and that much of this was outside the liability period. Defendants concede that Charcowicz called Jones "Buckwheat" while at work, as he admitted when interviewed by Superintendent Anderson

43.  Jones testified that he complained about Charcowicz to Superintendent Anderson and to several of his supervisors, including Reinberg, Greenwood, Jimenez, Jim Reeder and Gary Reeder.  Defendants concede that Jones complained to Superintendent Anderson about being called

**United States District Court**
For the Northern District of California

"Buckwheat."  Defendants also admit that Supervisors Greenwood and Jimenez heard the comments.

44.  Jones testified that Supervisors Jiminez, Greenwood and Jim Reeder dismissed his complaints with comments indicating that he should "not worry about it."  Jones testified that he did not know of management taking any action to stop Charcowicz from continuing to use such language nor is there any evidence of action in the record.  Defendants concede that Greenwood heard Charcowicz's comments but did not discipline him.

45.  Defendants' only contention in this regard is that  Anderson did not discipline Charcowicz because Anderson did not consider the term "Buckwheat" racially inappropriate. Manager of Human Resources Ramirez testified that she was aware that Charcowicz called Jones "Buckwheat," but she did not consider the term to be offensive.  The court finds this characterization is not credible and the remarks to be offensive, inappropriate and racially motivated.

46.  Jones also testified that co-employees Whitman and Gould repeatedly called him "Buckwheat."    Defendants deny that Gould used the term "Buckwheat" when referring to Jones. They do not specifically address whether Whitman used the term "Buckwheat," but defendants contend that Supervisors Gillum and Jaeger testified the they never heard Whitman say anything racially inappropriate.

47.  Jones testified that before and after 1990, he would find the word "Buckwheat" written in different places around the plant, including on machinery, steel coils and scrap paper. Defendants do not contest this allegation.

48.  Jones testified that he complained to Superintendent Anderson and to Supervisors Jiminez and Reeder about the graffiti which he believed had been perpetrated by Charcowicz.  Jones does not remember any action being taken.  Defendants do not address whether Jones complained about seeing "Buckwheat" as graffiti around the plant.  The court finds the incidents involving use of the term "Buckwheat" were sporadic over the liability period which ended in November 1991 when Jones left his employment at Marwais.  Even though offensive the use of this term was not so pervasive as to rise to the level of abusiveness and be actionable under existing case law.

49.  Jones testified that in late 1990, an African American co-worker Stuart Broughton was engaged in a task called rigging, and Charcowicz told Jones that Broughton was a "nigger rigger." Defendants do not contest that Charcowicz made a comment involving the phrase "nigger rigger."

50.  Plaintiffs contend that Jones related the comment in a complaint to Superintendent Anderson and to the DFEH.  Superintendent Anderson testified that he never heard the reference to a "nigger rigger."  Defendants also contend that Broughton never complained to Manager of Operations Williams about hearing a racial joke. .

51.  Jones testified that in the winter of 1990 or 1991, Supervisor Greenwood threatened Jones that if he damaged a steel coil, Greenwood would "go out and get the rope."  Jones interpreted the threat to refer to lynching.  Defendants concede that Greenwood made a reference to getting a rope when he was talking with Jones, they allege however that these were not actionable as isolated incidents of a co-worker.

52.  Jones testified that he complained to management and to the DFEH about Greenwood's comment.  Pls. Exs. 52, 126, 131.  As defendants did not contest this point, the court credits the testimony of Mr. Jones.

53.  Doug Aldridge testified that from 1994 to 1996, he heard employees co-employees Doug Whitman, Bill Duke, and Leroy Maestas use the word "nigger" and that Whitman spoke about African Americans being "worthless." Aldridge also testified that he remembered an incident in which Supervisor Jaeger asked Maestas to help an African American employee, and Maestas replied that "[he] wasn't going to help with this nigger."  Defendants do not contest that these three individuals used the term "nigger."

54.  Aldridge testified that sometimes such language was used in front of supervisors, but Aldridge was not aware of any supervisors addressing the offensive speech.  While defendants asserted at trial that these individuals never used the term in the presence of members of plant management the court does not credit this testimony in light of defendants' concession that Supervisors Gillum heard Maestas use the expression say "stupid nigger" in 1995.

55.  Aldridge testified that he never saw a supervisor take any action in response to use of the

15

word "nigger" by employees.  Gillum testified that he verbally admonished Maestas, but there is no document of the reprimand to support the claim.  The court does not give great weight to Gillum's testimony as Gillum was aware that the instant lawsuit was pending at the time he allegedly admonished Maestas.  Moreover, Gillum testified that he did not report the incident to human resources because he had never heard Maestas use the word "nigger" before.

56.  Aldridge testified that sometime between 1994 and 1996, he heard co-employee Gould refer to African American employees as "worthless piece of shit niggers" who "can't do anything right."  According to Aldridge, Gould often used such language when speaking to supervisors about his irritation with his co-workers.   Defendants deny that Gould has used the term "nigger" or other racially derogatory language in front of Aldridge.  Gould testified that he never said that an employee "was a worthless nigger and couldn't do anything right."

57.  Aldridge testified that Gould made statements including the word "nigger" directly to supervisors, including Supervisors Jaeger, Gillum and Reed.  Plaintiffs do not address whether Aldridge complained to management about Gould.  Defendants deny that Gould made such comments to Supervisors Jaeger, Gillum or Reed.  They also contend that Aldridge did not complain to Supervisor Jaeger about Gould using the word "nigger."

58.  Plaintiffs questioned Gould's credibility as while he denied that he had used the term "nigger," he admitted using other forms of racially offensive language such as "wetback" and "fucking Mexican."   Defendants concede that Gould used the phrase "fucking Mexican."  Defendants only contend that Gould meant it as a jest when he was talking to his friend, employee Pedro Lopez.  According to defendants, Supervisor Crawford and Manager of Operations Williams approached both men and told them such language was not appropriate for the plant.   Gillum testified that after having worked with Gould for ten months, he considered Gould "jovial and outgoing, polite" and that he had never seen Gould act in a racially inappropriate manner to African American employees.  Gillum also testified that though Gould swore often, he thought everyone else in the plant swore too.

59.  Aldridge, who is married to an African American woman, testified that he heard Gould

say, "that's what you get for marrying a nigger."  Aldridge testified that he asked Gould not to use that language in front of him, but Gould did not acquiesce.  Plaintiffs contend that Jefferson and Broughton also heard Gould make the statement to Aldridge.  Defendants deny that Gould has used the term "nigger" or other racially derogatory language in front of Aldridge.  Gould testified that he never made any racially derogatory comments about Aldridge's wife.  Aldridge testified that he did not complain to management because he thought such claims would be futile and other employees might harass him for seeking management's help.

60.  Summarizing the evidence of the use of the term "nigger" in the workplace, it is clear that the term was used by some employees during the liability period and that some supervisors were aware of some of the occasions.  However, plaintiffs have failed to establish that its usage was persistent and ongoing such as to permeate the workplace and rise to the level of actionable abusiveness.

61.  Aldridge testified that he heard Williams, the Manager of Operations, talk about African American employees in a more demeaning way than he would about white employees.   Aldridge testified that he noticed that Supervisors Crawford, Gillum and Jaeger would speak politely to him and other white employees but would not use such a polite tone when speaking with African American employees.

62.  Ron Jefferson also testified that he noticed that African American employees generally were spoken to less politely that white employees.  He testified that he felt African American employees also were more closely supervised.   This testimony was disputed by  Superintendent Anderson who testified that he did not observe any racial tension among employees during the over four year period he  worked at Marwais.    Given Anderson's response to specific and confirmable claims of racial harassment noted above, the court does not give his testimony great weight.  In addition, Jefferson's testimony was general, conclusory and lacking in detail.

63.  Adams and Clay testified that at a plant safety meeting, Superintendent Anderson told a story involving derogatory comments about the places where Hispanic people go to the bathroom.  While testimony on this story was somewhat extensive, it does not relate to derogatory comments

made at Marwais or about African Americans.  Thus, it has little relevance to whether there was a hostile work environment for African Americans at Marwais. [3]

### D. Racially Offensive Drawings and Postings

66.   Robert Adams testified that between 1989 and 1991, he saw racially offensive pictures in co-worker Mike Linton's office, including a picture of a white man with his penis in an African American man's mouth and a picture of an African American man with a tail.  Adams testified that the pictures were easily seen by the many employees who had occasion to enter Linton's office.  Defendants do not contest that Linton had these pictures in his office.   Defendants assert that these pictures were not reported to management and were isolated incidents by a co-worker.

67. Adams testified that he remembered Supervisor Reeder and Superintendent Anderson looking at the pictures.  Adams also testified that he complained about the pictures in a grievance in 1991 that Superintendent Anderson and Supervisor Bunker attended.   Defendants do not contest that Adams saw Reeder and Anderson look at the pictures.  Defendants only contend that Adams did not file a complaint specifically over the pictures he found in Linton's office although Adams referred to the pictures in a grievance he filed.  Adams testified that he was not aware of any response or follow-up to his complaints nor did defendants provide any such evidence.

68. Adams testified that sometime after March 1990, he saw a caricature of an African American man drawn on a concrete slab at Marwais.   Adams testified that the caricature was easily visible to plant employees.  Adams' testimony was corroborated by the testimony of Doug Aldridge who testified that about once a month between 1994 and 1996, he saw pictures meant to represent African American faces drawn on steel coils that had come to Marwais from Pinole Point Steel and Colorstrip.  Aldridge also testified that he saw a picture of two white men fishing in a boat with an African American man caught on their hook.   Ron Jefferson testified that in early 1994, he saw a caricature of an African American face drawn on a galvanized steel coil that had come from Pinole Point Steel.

69. Jones also testified that in early 1991, he saw a caricature of an African American face on a steel coil.  Jones testified that Charcowicz admitted to him that he drew it.

70.  This testimony was in dispute as to whether Adams complained to management about the  pictures.  It was not in dispute, however, that Jones complained about the caricatures to Supervisor Greenwood and Superintendent Anderson and through the DFEH process.  According to Jones' testimony, Anderson and Greenwood both looked at the coil with the drawing on it.   Also, Jefferson testified that he believed he complained to Supervisor Jaeger.

71.  Defendants contend that the graffiti in the plant was not racially-motivated and was isolated.

72.  Superintendent Anderson testified that he investigated all of Jones' 1991 complaints and could not substantiate them.  Defendants admitted however, that Anderson's investigation into Jones' complaint was deficient.

73.  Defendants also contended that "happy faces" are often drawn on steel coils at Marwais to mark coils that go together for an order.  Given that three separate employees testified that the pictures were not "happy faces",  but were caricatures and given the specific nature of Aldridge's testimony about another drawing which was not a "happy face," the court credits plaintiffs' testimony.

74.  Adams testified that in 1995 he saw swastikas drawn on three coils of steel that had been delivered from Pinole Point Steel.   Defendants do not contest that Adams saw swastikas in the plant but assert that they were isolated incidents.

75.  Adams testified that he showed the symbols to Lead Supervisor Crawford.   Crawford denied that he had heard any reports about swastikas drawn on plant property and that throughout the time he and Adams worked together, Adams never complained to him about racially offensive incidents at the plant.  Adams testified that he does not remember Crawford taking any action in response to his complaint.

76.  Marcus Harper testified that during the summer of 1991, he saw at least one swastika drawn on the stalls in the bathroom at Marwais.  Harper noted that the swastika remained on the stall throughout the summer.   Defendants do not deny that  Harper saw swastikas. Defendants only contend that Aldridge testified that he had never seen racially-offensive graffiti in the bathrooms at

the plant.

77.   Plaintiffs did not provide evidence that Harper complained to management about the swastika and defendants contend that no one filed a complaint with Supervisor Anderson about racial symbols in the plant.  Therefore the court concludes that management was not advised about this particular swastika.

78.  Chester Carter testified that in March 1994, he found a document he considered offensive that was titled "Application for Jesse Jackson Staff."  The document was posted on a bulletin board in the Marwais break room.  The document was in the form of a job application, and it contained typical application questions with stereotyped answer choices.  For example, one question asked for a description of the applicant's marital status, and the two answer choices were "common law" and "shacked up."  Clay and Jefferson also testified that they saw the application.   Defendants concede that the document was briefly posted in the plant.

79.  Carter testified that he distributed copies to Ken Williams, who at the time was the head of Marwais, and to the union shop steward.   Defendants concede that Carter took down the document and gave copies to Williams, to Supervisor Crawford and to the shop steward.

80.  Defendants testified at trial that  Supervisor Crawford first drafted a memo to brief Williams about the application.  After Crawford and Williams discussed the situation, Crawford investigated the origins of the application, and he and Williams held meetings with employees to discuss the situation.  Plaintiffs concede that Williams held a meeting with plant employees about the document.  Supervisors Jaeger and Matthews also held meetings with their teams to discuss the application and try to determine who placed it on the bulletin board.

81.  In response to the application Williams also drafted a memo about the need to be sensitive to such issues in the workplace.  Williams shut down operations in the plant to read the memo aloud to all employees.  Williams informed both Ramirez, Manager of Human Resources, and President Wais of the incident.

82.  Carter testified that after the meeting that Williams held to discuss the Jesse Jackson document, co-employee Gould asked Carter something like: "why do you guys take things so

United States District Court
For the Northern District of California

20

serious."  Gould denied making such a remark.

83.  Harper testified that during the summer of 1991, he observed a racially offensive caricature of African American basketball player Charles Barkley.   Defendants do not deny the existence of this picture.

84.  Jones testified that in 1990, he saw a picture of a black pig taped onto a control panel. Jones testified that he asked Charcowicz about the picture, and Charcowicz told him it represented an employee at Marwais who was African American.  Defendants concede that another employee, Willie Easter, also reported to Superintendent Anderson that he had seen a picture of a black pig taped on the paint line in 1990.  The court credits the testimony regarding the picture of the pig.

85.  Jones testified that he complained to Superintendent Anderson and through the DFEH process.  Defendants concede that Jones complained to Anderson about seeing a picture of a black pig.

86.  Superintendent Anderson testified that he investigated all of Jones' allegations and determined that he could not substantiate any of Jones' claims.  Company President Wais considered Anderson's investigation into Jones' complaint deficient and the court concurs in this assessment as two separate employees complained to Anderson about the picture even though Anderson may not have seen the picture himself.

**E.  Claims of Other Disparate Treatment**

87.  Adams testified that while Supervisor Bunker was employed at Marwais (1988 to 1993), Adams noticed that African American employees were assigned to the more isolated, dangerous, and unpopular clean-up duties.  Adams testified that he did not observe Bunker assigning white employees to perform the same duties.

88.  Adams testified that he complained about Bunker's practices through grievance procedures and the DFEH process.  It is uncontroverted that Adams complained to management about African Americans beings assigned to more dangerous and undesirable clean-up duties.

89.  Defendants contend that Anderson, Bunker and Ramirez investigated Adams' complaint, and Superintendent Anderson agreed with Adams that African Americans were disproportionately

1   assigned to outside clean-up duty.   However, Anderson testified that outside clean-up duties were

2   determined not by race but were  a responsibility of the processing department, and jobs were

3   assigned on the basis of seniority, the collective bargaining agreement, and skill.  Defendants

4   contend that the employees who had less skill at operating some of the processing machinery were

5   more often assigned to outside clean-up duty, regardless of their racial backgrounds.

6        90.  Defendants argue that Adam's ability level and performance record justified the

7   treatment and job assignments he received.  Defendants contend that Adams was not considered a

8   highly skilled employee.  Superintendent Anderson testified that Adams lacked the skills necessary

9   for some of the higher level jobs at Marwais.  He was considered able to do jobs related to

10  packaging, clean-up and the sawmill.  Superintendent Anderson also testified that Adams

11  complained about his job assignments and working environment regularly.

12       91.  Adams testified that Bunker used the company PA system to call African American

13  employees, but he did not do the same when he needed to call white employees.  Adams testified

14  that sometimes Bunker would call him over the PA system every hour.  While defendants did not

15  specifically address this claim, they contend that Adams tended to be slow, did not perform his tasks

16  with any sense of urgency and had trouble with the rules of the workplace.

17       92.  Adams also noted that Bunker spoke to him and other African American employees in a

18  demeaning manner.  Defendants concede that Bunker spoke rudely to Adams when assigning him

19  tasks but assert that this was a result of personality conflict and not race.

20       93.  Adams testified that a disproportionate amount of Bunker's reprimands were targeted at

21  minorities, particularly African American employees.  The facts bear this out.  During the period

22  March 1990 and March 1996, Terry Bunker only disciplined four employees – three African

23  Americans and one Hispanic.  As defendants have not come forward with any legitimate

24  nondiscriminatory rationale for the pattern of discipline, the court finds the discipline to be based on

25  race.  While Adams was penalized one day without pay apparently as to the remaining employees

26  there were only written reprimands with no other adverse consequences to plaintiffs.

27       94.  Adams raised this issue when he submitted his grievances.  Anderson testified that he

28                                                         22

had Supervisor Bunker prepare a report reviewing written and verbal reprimands by the race of the reprimanded employee that had been issued between 1985 to 1990.[4]  Based on this report, Anderson concluded that Adams did not receive more written or verbal reprimands than white employees because of his racial background.

95.  Adams testified that he submitted a grievance to Marwais management in which he included examples of Bunker's treatment of employees.

96.  Adams testified that in 1988 he and Clay were reprimanded for loafing, and, to his knowledge, it was the only time someone had been formally reprimanded for such activity. Superintendent Anderson admitted at trial that he was unaware of any other employees receiving such a reprimand.   Defendants deny that Adams' and Clay's reprimands were racially motivated. Defendants contend that the reprimands were simply verbal warnings, the lowest form of discipline, and the purpose was to stop employees from loitering on their way to work.

97.  Adams testified that Supervisor Bunker ordered him to leave his normal job assignment just before the end of his shift and go clean out the deodorant cakes in the bathroom urinals.  Adams testified that he spent the remaining fifteen minutes of his shift trying to create a tool to remove the broken pieces of the cakes.  The old cakes remained in the urinals until the next day.  Supervisor Bunker reprimanded Adams for failing to complete his duty and penalized Adams a day off without pay.  Superintendent Anderson admitted at trial that he did not know of any employees other than Adams who had been asked to clean out the urinal deodorant cakes.

98.  Defendants do not contest Adams' characterization of the reprimand.  They contend that the responsibilities of a processing specialist, which was Adams' job classification, include janitorial duties such as replacement of the urinal deodorant cakes.  Superintendent Anderson also testified that he believed Bunker's report that  Adams failed to change the deodorant cakes when he returned to work the next day.[5]

99.  Plaintiffs contend that Adams complained to management about the reprimand. Plaintiffs also contend that Superintendent Anderson admitted at trial that he remembered Adams filing a grievance about the reprimand.   Defendants contend that Adams never claimed the

23

reprimand was racially motivated.

100.  Adams testified that on June 22, 1990, he was cleaning up an area behind some electrical panels.  He testified that he accidentally dropped a paper from his pocket onto the floor, and when he picked up the paper, he also picked up another paper that had been laying on the floor. As he was examining this paper, Supervisor Bunker discovered him and thought he was looking at personal papers.  Adams testified that he refused to give Bunker his personal paper when Bunker demanded it, and Bunker subsequently gave him a written disciplinary notice and penalized him one day without pay.

101.  Defendants do not offer any direct evidence to refute Adams' testimony.  At trial Anderson testified that Supervisor Bunker had been looking for Adams for several minutes before finding him behind an electrical panel, writing something on a piece of paper.  Anderson testified that Bunker told Adams he would not issue a reprimand if Adams would show the paper either to him or the shop steward, but Adams refused.  Anderson testified that Adams admitted to Bunker that he had been doing personal work on company time.[6]

102.  The parties do not dispute that Adams filed two grievances in 1990 complaining about the reprimand from Supervisor Bunker and his feelings of harassment in the workplace. Adams' claims were reviewed by a Grievance Review Committee.

103.  Clay testified at trial that he told the Review Committee that Bunker used racially offensive language and mistreated  African American employees.   Defendants concede that Clay felt he had personally experienced offensive treatment from Bunker.

104.  Adams testified that Bunker once told him that "I've got you where I want you.  All I need to give you is maybe one or two [reprimands] more and you'll be on out the gate."   Defendants concede that  Bunker made this comment when he gave Adams a reprimand in 1992.

105.  Neither party contests that the Grievance Review Committee which was convened to address Adams' complaints concluded that no discrimination existed.  However, plaintiffs questioned the fairness of the result, citing that two of the four people on the examining board were Supervisor Bunker, whose behavior was at issue, and Superivor Anderson who had ratified Bunker's

choices regarding discipline.  The court questions whether a committee which included Bunker on the panel to review allegations of bias allegedly perpetrated by Bunker himself, could return a fair result and finds that based on Bunker's inclusion, the actions of the Grievance Review Committee do not insulate the company from potential liability.

106.  Adams testified that Supervisor Greenwood reprimanded him unfairly for failing to report an unsafe condition on a forklift and for causing an accident.  Superintendent Anderson testified at trial that the forklift had previously had a series of mechanical problems, including some causing the same accident that Adams experienced.  Anderson testified that he approved the reprimand because Supervisor Greenwood told him that Adams failed to tell a mechanic when he started experiencing problems on the forklift and, as a result, ended up crashing into a wall of the plant.

107.  Adams testified that he submitted a grievance to management because he felt the reprimand was unfair.  Adams testified that in response to his grievance, Marwais management reduced the severity of his discipline.[7]

108.  Adams also complained through the DFEH process and filed a federal court complaint.  Defendants concede that Adams filed a grievance but contend that he did not claim that the reprimand for the incident was racially motivated.  However, this proposition was contradicted by Anderson's testimony.

109.  John Clay testified that during a four year period every day that Terry Bunker was his supervisor, Bunker took him off his weekly job assignment and replaced him with a white employee.  Clay testified that Bunker would then assign Clay to less desirable clean-up duties.

110.  Clay admitted during trial that all employees in processing would occasionally be pulled off their scheduled jobs and reassigned, however, defendants conceded that each day when Bunker was Clay's supervisor, a white co-worker would be assigned to replace Clay on his scheduled duties, and Clay would be assigned to do clean-up.  Moreover although Anderson testified that Clay was a poor performer and that less skilled or senior employees were often assigned to tasks such as clean-up duty, the court finds that this rationale was undercut by testimony that Clay was no

25

longer assigned to clean-up duties after Bunker left Marwais.

111.   Clay tried to complain to Superintendent Anderson but Anderson typically would tell Clay to follow Bunker's orders or would ignore Clay.   Clay also complained through the DFEH process.   Defendants concede that Clay complained to Anderson ten to fifteen times during the four years Bunker was his supervisor.  Defendants further concede that Anderson told Clay to "obey the supervisor and do what he was told."  Defendants deny that Clay alleged that the treatment was race based.  The court does not credit Anderson's testimony in this regard.

112.  Jones and Carter testified that they also believed Bunker made assignments on the basis of race

113.   Clay testified that he trained several African American and white workers and found them to be equally competent, but Bunker hired only the white workers at the end of the probationary period.  Defendants concede that eight to nine employees were hired while Bunker was a supervisor and that all the African American but none of the white employees were eventually fired.  Defendants  contend that the terminations were not due to the race of the terminated employees given that some of the new employees had never even worked with Bunker or were fired after only a half a day on the job.

114.   Defendants do not offer evidence to refute Clay's testimony.  The only testimony defendants offered in this regard was Manager of Operations Williams' testimony  that no African Americans "were excluded from jobs on the basis of their race."

115.   Clay addressed the concern that Bunker's hiring practices were discriminatory in one of his DFEH complaints.  The court therefore finds that defendants were on notice of this claim.

116.  Clay testified that in September of 1990, Bunker called him a "Mandingo" who was capable of doing five jobs.  Clay testified that Bunker then assigned him to a set of responsibilities that would normally be assigned to four or five employees.  Defendants admit that Bunker called Clay "boy", but deny that Bunker assigned Clay more work than other employees or that Bunker used the term "Mandingo."  Defendants contend that Clay's complaints were not credible. Superintendent Anderson testified that Clay would often become confused or mistaken about events

United States District Court
For the Northern District of California

that he remembered, and that he was always very careful to question Clay closely about his complaints.[8]

117.  Jones testified that in February of 1991, he confronted Charcowicz because he had heard that Charcowicz had been drawing racially offensive pictures on steel coils and using the word "Buckwheat." Jones testified that they got into a heated argument and during the argument Charcowicz made racially offensive comments.  Anderson conceded that Charcowicz had called Jones a "monkey" or "black bitch".

118.  Jones further testified that Supervisor Greenwood learned of the argument the following day and threatened to fire Jones without listening to Jones' version of the event. While Jones was able to relate his version of the incident to Greenwood, Greenwood placed a negative warning in Jones' personnel file.

119.  Defendants conceded that Greenwood threatened to fire Jones if he informed the union of the incident.

120.  It is uncontested that Jones complained to Superintendent Anderson and through the DFEH process because he believed he was treated unfairly.  Greenwood also informed Anderson of the incident.

121.  Anderson testified that he told Jones that he would remove the disciplinary letter from Jones' file if he was able to find enough evidence to substantiate Jones' version of the incident. Anderson testified that he decided to leave the disciplinary letter in Jones' personnel file in part "as an example to everyone that racial acts would not be tolerated" even though the only person who claimed Jones had used racial language was Charcowicz.  While this action shows some disparate treatment between these two employees since Charcowicz did not receive a disciplinary letter, there is no evidence that Jones suffered any adverse consequences as a result.

122.  Chester Carter testified that sometime between mid-1990 and mid-1991, he was demoted from the shipping office because he had placed pictures of Malcolm X and Martin Luther King, Jr. on his desk.  Carter testified that when Bunker saw the pictures, Bunker told Carter that he would not tolerate the pictures and that such pictures were unprofessional.  Carter testified that he

was told about a week later that he would no longer work in the shipping office, and he was moved to a job with less responsibility. When Carter returned to his desk to remove his possessions, he discovered that the pictures had disappeared.

123. Defendants concede that Bunker told Carter that he did not know whether the pictures were professional. While they deny that the transfer was related to the photos, they articulate no specific basis for the transfer, stating only that the supervisor had the right to change Mr. Carter's job and  he was not required to give him an explanation.

124. Defendants deny that Carter's job transfer was a demotion. They contend that he experienced no change in pay or alteration in job classification level, however, Carter contended that there was additional responsibility associated with the position.

125. Defendants contend that Carter never complained that he had been transferred to a new job because of his race. Plaintiffs put forth no evidence on this point. The court finds that plaintiffs have failed to establish that Carter's transfer was for a discriminatory reason or to explicate the nature and extent of  his new responsibilities.

**F.  Claims of Failure of White Employees to Help African American Employees**

126. Carter testified that between 1993 and 1996, Supervisors Crawford and Jaeger required employees who had finished their tasks early to help their co-workers. Carter testified that only the African American slitter operators would help  the African American employees at the packaging table. He testified that the white slitter operators, including Whitman, Gould and Walker, refused to help. Clay  testified to the same effect. Defendants deny that any employees who were assigned to help package, including Gould and Whitman, ever refused. Defendants admit that Supervisor Jaeger had observed some employees not packaging who should have been, but they contend that almost all employees, regardless of race, at some time failed to help on the packaging line when their help was required. Defendants also maintain that employees working on the slitter machinery were not supposed to help at the packaging table when the slitter machinery was down. Only if slitter operators did not have other tasks to complete were they expected to help out at the packaging table.

127. Carter testified that he overheard white employee Gould say that he "wasn't going to

United States District Court

For the Northern District of California

help out those sorry bastards." Carter believed him to be referring to the African American employees at the packaging table. Gould testified that he did not refuse to help employees on the packaging line whenever he was instructed by a supervisor to help. Defendants also contend that Carter and Gould were friends, and they often joked around and made comments involving rough language. Supervisor Crawford testified that he once talked with both Gould and Carter to make sure neither was hurt by the other's joking or behavior. The court finds insufficient evidence on this point to conclude that white employees failed to help African American employees because of their race and that management failed to address such situation.

128. Carter testified that he and fellow employee Greg Wright were unfairly reprimanded because of their race. Carter testified that Supervisor Crawford suspended and reprimanded Carter and Wright for scratching a steel coil while operating one of the machines, even though Carter remembers that non-minority workers generally were not disciplined for causing more serious damage.

129. Aldridge testified that he had once caused similar damage that required some steel to be scrapped, but he had never been disciplined for such mistakes.

130. Defendants deny that the reprimand was unfair. They contend that Carter was negligent in his operation of the slitter. Slitter operators have the authority to require the slitter helper to be at his or her work station to ensure that there are no abrasions of the steel during the recoiling process. Defendants contend that Carter as the slitter operator had failed to require Greg Wright, the helper, to be at his post. Defendants contend that Carter should have ceased the operation of the slitter until someone could monitor the steel recoiling process. Instead, Carter operated the machine for one hour without the proper set-up in place to protect the steel. According to defendants, the steel was badly damaged due to Carter's lack of attention and had to be downgraded from its originally intended use. Supervisor Crawford and Manager of Operations Williams testified that they had not seen a piece of steel so badly damaged in many years. Defendants contend that no other employee had been disciplined for such a mistake before because no mistake of such magnitude had been made.

29

United States District Court
For the Northern District of California

131.  Plaintiffs provided no evidence that Carter complained to management about his reprimand.  Defendants contend that Carter never filed a complaint with management that he had received a reprimand based on his racial background.

132.  Ron Jefferson testified that in 1993, Supervisor Matthews extended Jefferson's probationary period instead of hiring him.  Jefferson testified that he had never been aware that his performance on the job needed improving.  He testified that he had seen several performance evaluations prior to the extension, and none indicated a reason prompting the extension of his probation.

133.  Defendants deny that the extension of Jefferson's probation was racially motivated.  Manager of Operations Williams testified that he decided to extend Jefferson's probationary period because he suspected Jefferson was unaware that his work was substandard, and he felt Jefferson should be given an opportunity to improve his quality of work.  Williams testified that he did not want the evaluation period to end when management was unprepared to decide whether to hire him.  According to Williams, he did not consider Jefferson's race when extending his probation.  Defendants also contend that Matthews testified that he did not treat Jefferson differently from other employees because of his race.  The court finds no evidence of racial animus in the extension of the probationary period, nor does the court find this action discriminatory.[9]

134.  Jefferson testified that white and African American employees were treated differently, particularly by Supervisor Crawford.  Jefferson admitted that he never heard Crawford make any racist comments.  Jefferson also voluntarily socialized with Crawford.  Crawford testified that he never heard from anyone that he treated African American employees worse than white employees.  While Crawford may have been less deferential in his tone to African American employees, the court finds no evidence of actionable discrimination by Crawford.

135.  Jefferson testified that he informed Vice President of Operations Martha Christopher of his complaints in late 1995.  Defendants concede that Jefferson had complained of "unfair" treatment but they assert he had not alleged racial discrimination. This was born out by the court's questioning of Jefferson.

30

**United States District Court**
For the Northern District of California

136.   Jefferson testified that he observed Supervisor Matthews treating employees differently based on their races.  He also testified that Matthews was only friends with one African American employee, Carter, with whom Matthews had been friends before coming to work at Marwais. Defendants deny that Matthews reprimanded or monitored African American employees more than he reprimanded white employees.   The court finds no evidence of discrimination by Matthews.

137.   Jefferson testified that co-worker Gould swore at him and other African American employees.  Jefferson also testified that Gould would refuse to help him, even when a supervisor requested that he give Jefferson aid.  Defendants do not contest that Gould swore at African American employees, however, Gould testified that he also swore just as much at white employees. Gould testified that he swore at Jefferson because he was angry about Jefferson blaming a mistake on Gould, not because Jefferson is African American and there was no evidence that Gould's swearing was racial in content.  After Gould was admonished he did not swear at Jefferson again. While Gould's use of profanity was inappropriate for the workplace, the court finds insufficient evidence that Gould's swearing constituted racial harassment.

138.   Jefferson testified that Supervisor Jaeger disciplined him for failing to come to work even though Jaeger had given him permission not to come.  According to Jefferson's testimony, he called in to work after having overslept, and Supervisor Jaeger told him not to hurry to work because he would not be needed.  Jefferson testified that he later discovered that Jaeger had issued him a reprimand accusing him of having been absent without leave on that day.   Company policy requires a "call-in 2 hours before the shift begins."  Jefferson admitted at trial that he violated company policy, however, he contended that his treatment was discriminatory because he remembered that a white co-worker, Chuck Gould, had come to work over an hour late and Jaeger had not marked him absent without leave.  Defendants do not contest  Jefferson's allegation about Gould.

139.   Jefferson testified that the packaging line jobs were less desirable than other jobs at the plant.  Jefferson testified that he had to work on the packaging line more than any of his white co-workers.  Defendants deny that Jefferson's job assignments had any relation to his race.

140.   Jefferson testified that he complained to Supervisor Crawford that he had to work on

31

the packaging line more than any white employees.  Jefferson testified that Supervisor Crawford never altered any job assignments in response to Jefferson's complaint.  Defendants concede that Jefferson complained to management about his work assignments, but they emphasize that Jefferson did not indicate his complaints were about race-based treatment and that Williams determined that Crawford's decisions regarding Jefferson were not made due to his race.   The court finds that there is insufficient evidence from which to measure or compare these job assignments or to show racial discrimination.

141.  Doug Aldridge testified that when he made mistakes in his paperwork, Supervisor Crawford would alert him and let him correct his work.  According to Aldridge's testimony, Crawford did not give African American employees the same amount of leeway.  Aldridge testified that Crawford once suspended Anthony Cheney for a mistake similar to one that Aldridge had made but was allowed to correct without penalty.

142.  Aldridge testified that he injured himself four to five times while working at Marwais, but he was never required to have a drug test after any of the accidents.  Aldridge testified that he noticed that African American employees were required to get drug tests after sustaining injuries.  Aldridge also testified that he was never formally reprimanded for failing to wear protective gear, such as gloves, even when such failure contributed to an injury.   Defendants concede that Supervisor Jaeger did not formally reprimand Aldridge when Jaeger saw him working without the proper safety equipment, but defendants contend that Jaeger did speak with Aldridge informally about the need to use his protective gear.  Defendants do not address Aldridge's claim about race-based drug testing requirements.

143.  Aldridge testified that Supervisor Crawford showed him a stack of reprimands that Crawford had prevented Supervisor Jaeger from filing so Aldridge would be better able to secure a job after leaving Marwais.  Plaintiffs contend that African American employees never received such treatment.   Supervisor Jaeger denied this allegation and  testified that he never wrote any reprimands for Aldridge that he did not issue.  The comparison testimony proferred by plaintiffs is too generalized and lacking in sufficient specificity for the court to determine whether race was a

United States District Court
For the Northern District of California

1    factor in defendants' actions.

2         144.  Aldridge testified that Supervisor Crawford had Aldridge temporarily run the slitter

3    machinery even though Aldridge was not interested in the position and more senior African

4    American employees Cheney and Jefferson were interested.  Aldridge considered the job assignment

5    to be a promotion from his original job as it involved an increase in pay.  Aldridge testified that

6    when Supervisor Crawford offered him the position, Crawford had not followed company

7    procedures requiring the posting of a bid sheet for open positions.   Defendants contend that

8    Aldridge filled the temporary position of slitter operator because he had already developed some

9    knowledge of slitter operation, and no one else was available to fill the position.  According to

10   Supervisor Jaeger's testimony, Jaeger, not Crawford, made the decision to move Aldridge to slitter

11   operator.

12        145.  Defendants concede that Cheney complained to management about the situation.

13   However, defendants contend that neither Cheney, Jefferson nor Aldridge ever indicated to

14   management that they felt the slitter operator decision was motivated by race.  Defendants contend

15   that plant management thought Cheney's complaint was only about seniority.

16        146.  Defendants further contend that Marwais management had already put Cheney into

17   training for slitter operation even before he complained about Aldridge's position.  Defendants

18   contend that when Cheney completed his training, Aldridge became his helper.  Thus the court finds

19   no evidence of racial discrimination in these assignment actions.

20        147.  It is uncontested that in September of 1992, President Wais, Superintendent Anderson,

21   and Human Resources Manager Ramirez received a letter from the "employees of Marwais Steel

22   Co." complaining about racial discrimination at the plant and particular instances of discrimination

23   by Supervisor Greenwood.

24        148.  President Wais testified that he launched an investigation into all the accusations

25   contained in the letter.  According to Wais's testimony, he ordered Ramirez, the Manager of Human

26   Resources, and Supervisor Matthews, an African American member of plant management, to

27   investigate the complaints contained in the letter and report back to him regarding any racial

28
                                          33

discrimination issues.  Ramirez had Superintendent Anderson conduct some interviews.  Anderson testified that he questioned Supervisor Greenwood and employee Doug Whitman, both of whom were accused of racism and drunkenness in the letter, and both men denied all the allegations.  Defendants concede that Anderson did not follow up on these interviews.  They admit that Anderson reported the information to Ramirez without corroborating the denials with other sources.

149.  Defendants further concede that during Ramirez and Matthews' interviews, Clay and Jones related stories of racial harassment in the plant.  According to defendants, Jones told Ramirez about the cantaloupe dolls.  Ramirez testified that she did not investigate the dolls because she believe the incident was not a current or ongoing issue.

150.  Ramirez reported to President Wais that the Marwais employees felt positively about Marwais management and that she had not learned of any incidents of racial discrimination during her interviews.  Matthews testified that he had also not found evidence of "racial anxiety" in the plant.

151.  Even if the defendants had conducted a thorough and objective investigation, the receipt of the letter put management on alert for evidence of racial tension in the plant.

152.  Defendants were also on notice based on the petition Adams had circulated protesting Supervisor Bunker's racially hostile behavior.  President Wais testified that he hired a lawyer to investigate the allegations of the petition.  Wais further testified that the attorney interviewed the employees who had signed the petition except for Adams and Clay, who refused to cooperate.  President Wais testified that the manager of production planning reported to him that he felt the problem between Bunker and Adams was rooted in personality and management style differences, not racism.  Superintendent Anderson testified that he spoke with the employees who signed the petition, and he agreed with Simon that the problem was more likely one of personality differences rather than a problem of race discrimination.

153.  On approximately January 17, 1991 Superintendent Anderson gave Bunker a letter advising Bunker to be more aware of employee reactions to his management style.  The letter did not address any issues of racism.  President Wais told Superintendent Anderson that in the future he

needed to be particularly sensitive to claims of discrimination in the plant.

## V. PINOLE POINT STEEL

### A. Racially Offensive Objects

154. Ken Russell testified that each day for a one-week period in 1991 or 1992, he discovered a noose hanging from his work station. He testified that he would remove the noose and throw it away each morning but it would reappear the next day. According to Russell's testimony, the nooses were hanging in an area where supervisors were likely to see them. Defendants do not contest that Russell saw nooses each day for one week.

155. Russell testified that he did not complain to management about seeing nooses, but Ramirez, the Human Resources Manager, admitted at trial that Russell told her that he had found nooses at his work station. According to plaintiffs, she did not investigate Russell's complaint. Defendants deny that Russell ever complained to management about the ropes.

156. While defendants contend that there were loop-tied ropes in the plant that had a legitimate non-discriminatory, Russell testified that he knew of no legitimate, business-related reason for ropes knotted like nooses to be in the plant. At trial, Russell testified that defendants' examples of loop-tied ropes did not resemble anything he had seen in the plant before, and he did not consider them to be similar to nooses. Spicer, Cooper and Harper also testified that they had never seen a rope tied like the ones defendants showed as examples of loop-tied ropes. Supervisor Davis, defendants' witness, testified during his deposition that he had never seen ropes hanging from cranes and then changed his testimony at trial to indicate that he had seen wire ropes hanging from cranes thus the court questions his credibility.

157. Russell also testified that in 1993 he saw a noose dangling from a crane with a "dark" figure hanging in it. He testified that he saw the noose when he arrived at the plant early in the morning, and it was still up after lunch time. He also testified that the crane operator used the crane despite the noose and doll hanging from the end of it. Defendants do not deny Russell's claim.

158. There is no specific evidence that Russell complained to management about seeing this

35

1   noose in the plant

2          159.  Dexter Ballard testified that in approximately August of 1990, he saw a doll hanging

3   from a noose that was suspended from a crane inside the plant.  Ballard testified that the face of the

4   doll had been colored black.  Defendants do not contest that Ballard saw a noose with a doll hanging

5   from it.  They only contend that the year in which Ballard saw the object could have been 1989 or

6   1990.

7          160.  Ballard testified that the doll and noose were visible to everyone in the plant.  Ballard

8   also testified that he heard Supervisor Larry Renaude laugh upon seeing the doll and then say "Okay

9   guys, you guys had your fun now.  Let's go ahead and take it down."  According to Ballard's

10  testimony, the crane operator laughed in response.  Defendants do not deny that the doll and noose

11  existed, they only contend that Ballard did not complain to management about seeing the object

12  hanging from the crane. This contention is unavailing, however, since the court credits Ballard's

13  testimony that a plant supervisor was present.

14         161.  Ballard testified that he was not aware whether anyone was disciplined for the incident

15  or whether management ever discussed it with employees.

16         162.  Mustapha Cannon testified that sometime after 1990, he saw a doll hanging by a rope

17  noose attached to a stepladder.  The doll was made of a black rag, and it had steel wool for hair.

18  Cannon testified that it was visible to anyone walking to the lunch truck.  Cannon also reported that

19  he was with Russell and Cooper and approximately twenty other employees when he saw the

20  hanging doll.  According to Cannon, Russell removed the doll and noose.

21         163.  Defendants question Cannon's credibility regarding seeing dolls in the workplace.

22  Defendants note that Cannon testified that he saw the doll during a day shift, but they contend that

23  Cannon only worked swing shift during the time period in question.  Cannon testified that he moved

24  from the day shift to the swing shift in approximately 1992, and he occasionally worked day and

25  graveyard shifts even after his move to the swing shift.  Interestingly, defendants exclude this part of

26  Cannon's testimony when they cite to the record to support their contention that Cannon could not

27  have been on the day shift sometime after 1990 and therefore "has been willfully false in his

28

United States District Court
For the Northern District of California

testimony."[10]

164.  No evidence was presented that Cannon complained to management about seeing dolls in the workplace or that management was otherwise aware at this point in time.

165.  Lee Cooper testified that sometime between 1992 and 1994, he saw a noose hanging in the slitter area.  Cooper testified that he was walking to the lunch truck with Cannon and Russell when he saw the noose.  According to Cooper's testimony, the noose was hanging about six feet in the air, and the loop was large enough for a person's head to fit inside it.  Cooper believed Russell removed the noose, but he did not personally observe Russell remove it.[11]

166.  Cooper testified that the noose was in a location where hourly workers and supervisors would easily see it.  Defendants only contend that Cooper did not complain to President Wais about seeing a noose in the plant.

167.  Supervisor Cary Felciano is not a plaintiff in this action.  Felciano testified that sometime after 1990, he saw a noose hanging near the shipper's desk.  Felciano testified that the noose remained up for about a week, and it was not there for any business-related purpose.  Defendants do not contest Felciano's testimony.

168.  Felciano testified that he did not inform any members of management about the noose, however, the noose was in an area where it would be visible to many employees of the plant.

169.  Felciano, who was a supervisor himself, did not investigate who might have put the noose up and did not take the noose down himself.  Felciano admitted that he understood that an African American might find such an object offensive.  While this testimony may have some evidentiary value as to conditions at the facility, it is not clear that the incident occurred within the liability period.

170.  Marcus Harper testified that in the summer of 1992, he saw a black doll hanging from a rope around its neck.  He testified that the doll was readily visible to most employees.  Harper's credibility on this point was reasonably questioned as in his 1996 declaration outlining racially offensive incidents he observed at Pinole Point and Marwais, he failed to mention any reference to a doll hanging from a noose.  His first reference to it was his testimony at trial.  Even if his testimony

United States District Court
For the Northern District of California

1   is believed, this was a single incident witnessed by Harper who worked at Pinole only during the

2   summer of 1992.

3         171.  Mustapha Cannon testified that in 1993 or 1994, white employee Bill Brown told

4   Cannon one morning to look inside the microwave in the lunch room of the plant.  When Cannon

5   did, he discovered a black rubber penis with the head of African American rap singer MC Hammer

6   attached to it.  While defendants question whether Cannon could have seen an object at the plant in

7   the morning since he worked the swing shift in 1993 and 1994, defendants misapprehend Cannon's

8   testimony about the shifts he worked.

9         172.  Cannon testified that ten to fifteen other employees were in the area when he saw the

10  item in the microwave.  Cannon testified that he reported the incident to Supervisor August McCoy,

11  an African American supervisor, and McCoy removed the object from the microwave.  Cannon was

12  not aware if there was ever an investigation into the incident.

13        173.  Cannon testified that sometime between 1993 and 1995, he saw a doll tacked to the

14  lunchroom bulletin board with a note saying "Lee Matthews [an African American supervisor] on

15  crack."  Cannon testified that seven or eight other employees were in the lunch room when he saw

16  the doll.

17        174.  Cannon testified that he saw Supervisor Jaeger remove the doll.   However, defendants

18  deny that Jaeger ever saw a doll or a sign with the words "Lee Matthews on crack."   Cannon was

19  not aware of any subsequent  investigation into the presence of the doll nor did he report the incident

20  to management.

21        175.  Lee Cooper testified that sometime after March of 1990, he saw a black gorilla doll

22  hanging from a crane in the plant.  He testified that he believed the doll could be seen from most

23  places on the shipping side of the plant and that it remained up for at least eight hours.   Defendants

24  do not address Cooper's testimony.

25        176.  Supervisor Felciano testified that sometime after 1990, he saw a doll in a trash bin, the

26  lunch table and possibly the shipper's desk as well.   According to plaintiffs, Felciano testified that

27  he did not think it was odd to see a doll in the plant.  Defendants concede that Felciano saw a doll in

28

**United States District Court**
For the Northern District of California

the plant, but contended it was unclear from the testimony whether the doll was racially offensive. Given the weight of the testimony regarding dolls in the plant, the court finds credible evidence that the dolls were intended to be, and were, racially offensive.

177.  It was uncontested that in approximately 1994 Jack Spicer saw a doll in the plant that had its face painted black and which had nails in it with red paint dripping from the nails like blood. According to Spicer's testimony, the doll was in an open area that supervisors often passed through, and it remained out in the plant for two nights.  It is also uncontested that employee Clyde Barrett saw the doll.  There is no evidence that Spicer complained to management about the doll.

### B. **Racially Offensive Written or Verbal Statements**

178.  Dexter Ballard testified that in late 1988, he saw the word "nigger" written on his locker.  Ballard testified that he wiped off the writing.  Defendants do not contest Ballard's testimony about the graffiti on his locker but contend that Ballard did not inform management of the graffiti.  Ballard asserts that he did not report the graffiti on his locker because he thought a complaint would be futile.  The court finds that this incident, even if true, is outside of the liability period.

179.  Ballard testified that sometime in mid-1990, he heard co-workers Dave Dickey and Dale Maus use the term "nigger" and refer to an area as "nigger town."  He also heard Dickey say that there were "too many niggers working around here."  Defendants contend that use of the word "nigger" at the plant was not necessarily offensive because many African American employees used the word themselves.  The court is not persuaded by this rationale and finds use of the word "nigger" as used here is racially derogatory.  The court's finding is further supported by Ballard's testimony that in late 1990, employee Steve Lumpkin told him: "I don't regard you as a nigger because you work and support your family."  Ballard testified that he told Lumpkin not to use the term "nigger" because it was offensive.  The court is persuaded that at least some of these comments occurred during the liability period.

180.  Ballard testified that between 1988 and early 1991, he received a series of racially offensive note cards in his locker.  According to his testimony, the first note contained the words

39

"you fucking boy."  Ballard testified that the second and third notes appeared in early to mid 1989. The second card contained a picture of a pygmy made to look like an African American stereotype, and the third contained the phrase "Go Back to Africa."  Ballard received the fourth and fifth notes in mid to late 1989.  These notes contained the writing "Dumb Ass Nigger" and "Stupid Ass Nigger."  The sixth note, which Ballard received in 1991, contained the phrase "Dumb Ass Boy." Ballard testified that he tore up and discarded all the notes.  Defendants do not contest Ballard's testimony about the note cards.  They argue instead that the first five note cards fall outside the statute of limitations because they were allegedly received before 1990.   The only note that falls within the liability period is the sixth one.  However, the earlier ones taken together with the sixth show a pattern of racial animus on the part of the person(s) who wrote and/or left them in the locker.

181.  Ballard testified that he told his supervisor, Bob Farris, when he received the first note card.  Ballard testified that Farris told him he would "look into" the matter.  Ballard does not remember Farris discussing the incident with him again.  Ballard did not complain about any of the other cards because he was afraid he would not be taken seriously or that his job might be put in jeopardy.

182.  Hugh Barnett, who was the Director of Operations/Plant Superintendent and who is not a plaintiff, testified that during his employment at Pinole Point, which extended from 1987 to 1993, he heard racial jokes and saw racially offensive graffiti written in the plant bathrooms.  He testified that he reported both the jokes and the graffiti to President Wais and Human Resources Manager Ramirez.  Defendants contend that there is no evidence indicating whether the jokes or graffiti Barnett allegedly witnessed happened during the statutory period.  The court finds sufficient evidence to conclude that some of this racially offensive graffiti occurred during the liability period.

183.  It is uncontested that in 1991 Barnett saw a note that had been placed in the plant suggestion box that said something to the effect of "Why do we have to work with Blacks?"   There is no evidence as to who placed the notes in the box or that anyone else saw it.

184.  While Barnett testified that he informed Human Resources Manager Ramirez, she denied having seen the note.  There is no evidence that any investigation was conducted nor is the

40

United States District Court
For the Northern District of California

1  court persuaded that the defendants were compelled to conduct one, since this seems to have been

2  the only such note and given the particular circumstances surrounding it.

3      185.  Maintenance Manager Steve Brombacher, who is not a plaintiff, testified that in  1992

4  he saw the word "nigger" written in the bathroom used by employees in the maintenance

5  department.  Defendants concede that Brombacher saw graffiti in a plant bathroom.

6      186.  Brombacher testified that he had someone remove the writing, and he recalled that only

7  six hours lapsed between when he saw the graffiti and when it was removed.   However, there is no

8  evidence that Brombacher, who was a Manager, investigated who wrote the graffiti, reported it to

9  upper management or instructed his subordinates that writing graffiti and using the word "nigger"

10  was unacceptable.

11      187.  Mustapha Cannon testified that in 1994, white co-worker Jack Wade told him that

12  Supervisor Frank Davis referred to Cannon as an "all right nigger."  Cannon testified that when he

13  approached Davis to discuss the allegation, Davis denied it and said that Wade had been the one

14  who made the statement.  This is inadmissable hearsay.  In addition, defendants deny that Davis

15  called Cannon an "all right nigger."  They also deny that Cannon ever discussed with Davis a race-

16  related issue.

17      188.  Lee Cooper testified that in 1990, he overheard other employees referring to an area of

18  Napa as "niggerville."  Defendants' argument that Cooper would not have considered this term

19  racial harassment as  Ken Russell testified that he had heard Cooper use the term "nigger" while at

20  the plant is not a legitimate contention.  However, there is no evidence that Cooper complained

21  about the comments.

22      189.  It is uncontested that in 1991 or 1992, co-worker Wade told Cannon and Russell some

23  race-related jokes about Rodney King.  Defendants contend that Cannon did not find the jokes

24  offensive as he repeated the jokes to other employees in the plant and Cannon continued to drive to

25  work occasionally with Wade, even after Wade told the offensive jokes.

26      190.  It is uncontested that in 1993 or 1994 white employee Jack Wade told Cannon a

27  racially insensitive joke involving the KKK.[12]  The court finds that the fact that Wade told the joke

28

three times before Cannon informed Wade that he found the joke offensive, does not make the joke any less offensive.[13]

191.  Cannon testified that he complained to his foreman, August McCoy, about the joke. Defendants question Cannon's credibility on this point as Cannon did not mention the jokes when he spoke with President Wais, Ken Williams, the Manager of Operations, or Margaret Ramirez, the Manager of Human Resources.

192.  Cannon testified that sometime after March of 1990,  white employee Chris Felciano called him "boy" twice.  Cannon testified that when he told Chris Felciano not to call him "boy," Supervisor Cary Felciano, Chris' brother, told Cannon not to speak to Chris in such a manner. Plaintiffs note that Cary Felciano testified that he did not overhear their conversation because he was on the phone, and he denies that he made any statement to Cannon about the conversation. Defendants do not address whether Chris Felciano called Cannon "boy," but they deny that Cary Felciano was present for the conversation or made any comment about it.

193.  It is uncontested that between June 1993 and July 1994, white employee Joe Walker referred to African American Supervisor August McCoy as "Sammy" both over the PA system and when talking to McCoy.[14]  Defendants assert that Walker called McCoy "Sammy," because McCoy has the same stature as did Sammy Davis, Jr.  The court is not convinced that this in and of itself constitutes racial harassment.

194.  Plaintiffs contend that Ken Williams and Cary Felciano held a meeting to tell employees not to use the term "Sammy".  Cannon testified that Walker continued to use the term even after Williams and Felicano's announcement.  Cannon does not believe anyone was disciplined for having used the term.  Defendants do not address whether management responded to the use of the term "Sammy" in the workplace.

195.  Cannon testified that in 1994, he asked Supervisor Cary Felciano why he was not assigned to run machines, and Felciano responded, "Because I'm prejudiced.  Is that good enough for you?"  Cannon testified that he responded,  "It must feel good to come out of the closet." Felciano testified that he did not make a statement to Cannon about being prejudiced.  Defendants

**United States District Court**
For the Northern District of California

attempt to cast doubt on Cannon's testimony.  Even if such a statement occurred it does not amount to an actionable claim.

196.  Cannon testified that a few months after the incident, he complained to Ramirez, the Manager of Human Resources, and then to Superintendent Williams.  He testified that Ramirez took notes on his complaint but did not take any action in response.  Ramirez testified that Cannon did not inform her of his allegation about Felciano making a statement about being prejudiced.

197.  Cannon also testified that white employees sometimes made fun of the way African American employees spoke.

198.  Cannon testified that in 1994, he complained to Ramirez, the Manager of Human Resources, about the way white employees teased African American employees.  Cannon testified that he also complained to Ken Williams.  He was not aware of either Williams or Ramirez taking any action in response to his complaints.  Defendants deny that Cannon ever complained to Williams about anyone making derogatory comments about his speech.  They also deny that Cannon ever complained to Ramirez about any "allegedly racial conduct."

199.  Cannon testified that in 1994 or 1995, he saw a note on the lunch room bulletin board that said "jigaboo."  Defendants do  not deny that such a note existed. However, there is no evidence that management had knowledge of the alleged note.  Nor is there evidence of its context or how long the note remained on the bulletin board.

200.  Chester Carter testified that when he was being considered for a foreman position in 1992, he discovered a note at his work station with the words: "so you're going to be the head nigger in charge."  Carter testified that white co-workers would make comments to him such as: "you're going to be their boy or token now."  Carter testified that he declined to pursue the position because of the notes, the possibility that he was considered only because he was African American, and his fear that he was not knowledgeable enough to be an effective foreman.  After informing Williams of his decision not to pursue the position, Carter testified that he received a note on his locker saying, "good choice."

201.  Defendants do not contest that Carter experienced such treatment.  The testimony at

United States District Court
For the Northern District of California

trial showed that Pinole Point management made efforts to hire an African American foreman in late 1992. Defendants testified that Carter was a qualified candidate and could have made a good fit with the department for which he was considered.

202. Defendants contend that Carter told President Wais that he declined the position because "the timing wasn't right" and he did not want to feel "pressure from his black coworkers." However, there was also uncontested testimony that Carter complained to Williams about hearing offensive comments from other employees. While defendants contend that Williams held a meeting to inform employees that such conduct would not be tolerated, Williams's actual testimony was that he held a meeting "about the general topic of the foreman's position," without mentioning whether it was prompted by complaints regarding tension in the plant due to the promotion considerations.

203. Plant management invited three African American employees, Cooper, Carter and Anderson, to be candidates for the foreman position. All three ultimately declined the opportunity. Defendants do not address why Cooper or Anderson declined, only citing that Carter did not feel he had earned the position. On the other hand there is insufficient evidence that any of the three employees communicated to management the reasons they proffer here.

204. Cooper testified that in 1997, he saw racially-motivated graffiti in a portable toilet outside the plant. Cooper testified that the writing read "wet Blacks from Africa." Defendants concede that the graffiti was in the portable toilet.

205. It is uncontested that Cooper showed the graffiti to Martha Christopher. Christopher testified that she reported the graffiti to President Wais within twenty-four hours, but at trial President Wais denied learning of the graffiti. Defendants contend that Christopher photographed the graffiti and reported the incident to Ramirez, Manager of Human Resources, and President Wais. Christopher had assumed that the graffiti had been done by someone outside the plant, however Cooper was not aware of any investigation into the graffiti. The portable toilet was removed from the plant the day after Cooper notified Christopher of the graffiti.

206. Marcus Harper testified that during the summer of 1992, Manager Steve Brombacher called him "boy" several times. Harper also testified that another maintenance manager called him

44

United States District Court
For the Northern District of California

"boy" four or five times that summer, but he could not remember the manager's name.  There is no evidence that Harper complained to any member of management about being called "boy" or that he ever informed Brombacher that he was offended by Brombacher's use of the term.[15]

207.  Ken Russell testified that in 1992 or 1993, he saw the phrase  "Serb's daddy is a nigger" in the restroom used by employees in the shipping department.  Plaintiffs note that Serb was a white employee at the plant.  Russell testified that the writing remained in the bathroom for several months to a year.  Defendants do not contest Russell's testimony.

208.  Russell testified that he complained to President Wais about seeing the word "nigger" written in the bathroom.  Defendants only response is that Russell never grieved any of his claims of racially offensive graffiti in the plant.

209.  In 1992, Russell asked Manager Bill Brady what he should wear to an NAACP dinner that required a coat and tie.  Russell reports that Brady responded, "if you don't have a coat, you can wear this coat," indicating Russell's work coat.  According to Russell, Brady also said, "if you don't have a tie, you can wear a rope around your neck."  Cooper and Cannon also heard Brady make this remark.  Russell, Cooper, and Cannon all believed the comment to be a reference to lynching.  Russell later complained about the incident to Human Resources Manager Ramirez.  Cooper testified that Ramirez and Manager of Operations Barnett spoke to him about the comment, and Cooper told them that there were a number of people in the plant who needed "help" for the similar racially offensive conduct.

210.  In 1993 or 1994, Russell heard Kevin Korte, a white co-worker, use the word "nigger" when referring to Supervisor Matthews, who was African American.  Russell remembers hearing him say "I ought to kick that nigger's ass."  Russell told him he did not like Matthews either but he was still offended by Korte's use of the term "nigger."  Plaintiffs allow that Russell heard African American employees use the word "nigger" at the plant, but Russell noted that he felt the word meant different things when used by African American versus white people.  Russell felt it was a much more demeaning and derogatory term when used by white people though it was still generally offensive to him regardless of who said it.

211.  In 1992 or 1993, Russell saw graffiti in the locker room restroom that said "Kill Rodney King."  He remembers the graffiti remained on the wall for a some period of time, but doesn't recall for how long or when it disappeared.

212.  It is undisputed that in 1992 or 1993, Supervisor Cary Felciano told Russell that he should get back to work because he was "no longer on the plantation.

213.  In 1994 while Jack Spicer was working the graveyard shift, Spicer overheard a foreman use the phrase "niggered the job."  Spicer could not remember the name of the foreman, but he knew the man was wearing a white hat, which indicates that he was a foreman.  Spicer also thought the foreman was standing behind him, talking with another foreman about some badly done work that Spicer was re-doing.  Spicer remembers the same foreman using the phrase on one or two other occasions as well.

214.  Sometime between June of 1993 and July of 1994, Spicer saw writing on a wall in the locker room restroom referring to African American Supervisor August McCoy as being a drunk.

215.  Sometime between June of 1993 and July of 1994, Spicer remembers hearing white co-workers Ken Wright and Rick (Spicer does not know Rick's last name) talking about Supervisor McCoy in terms Spicer felt were racially motivated.  The men discussed how they would not help McCoy if he needed them to do anything.  At the time, McCoy was the only African American foreman at Pinole Point.  Another employee, Jerry Robertson, heard similar comments from white co-workers, including Dennis Dowling and Rick Carillo, and observed that they did not cooperate with McCoy when working.  Cooper also testified that he had heard that white employees did not want to help McCoy.  Several of these reports consist of hearsay.

216.  In late 1995 or early 1996, about three months before white foreman Bill Chandler left Pinole Point, Spicer heard Chandler call him "Step'n Fetchit," an African American actor who portrayed a negative stereotypes of African Americans.  Spicer remembered that Chandler laughed when he used the term.

217.  Jeff Jaeger, who is not a plaintiff in this action testified that he saw  co-employee Kevin Korte wearing a hat with the letters "KKK" on it.  Jaeger thought the letters might have been Korte's

46

1   initials, but they were not; Korte's initials are "KPK."  The initials remained on the hat for only a

2   day or two.

3   **C.  Racially Offensive Drawings and Postings**

4   218.  Dexter Ballard testified that in early 1989, Ballard found a note in his locker with a

5   drawing on it.  Ballard described the drawing as a cartoon head with big lips and "nappy" hair.

6   Ballard understood the drawing to be a caricature of an African American.

7   219.  In early to mid-1989, Ballard also found a picture of Buckwheat and a picture of a

8   black pig taped to the outside of his locker.  The picture of the pig was a tracing that had been

9   colored in with a black marker.  Ballard threw the pictures away.

10   220.  Sometime after April of 1990, Hugh Barnett heard that a swastika had been drawn on

11   one of the plant's forklifts or trucks.  He spoke with Ramirez, Manager of Human Resources, about

12   the incident.  The report, of course, is hearsay; however, the report serves as notice to another person

13   in management.  There is no evidence as to whether this report was investigated.

14   221.  Sometime between 1992 and 1994, Lee Cooper saw a drawing of a black monkey in the

15   lunchroom.  According to Cooper, the picture had either the name "Leroy" or the word "foreman"

16   written underneath it.  Cooper interpreted the drawing to be about Leroy Matthews, who at the time

17   was the only African American foreman at Pinole Point.  Cooper does not remember an

18   investigation into the picture.  However, he did not make a complaint or report about the drawing.

19   Supervisor Farris testified that he "may have seen something derogatory written about foreman

20   Leroy Matthews in a bathroom."

21   222.  In 1996, Cooper remembers that a drug awareness poster had been left at his work

22   station.  The faces of the people in the poster had been colored in with black paint. According to

23   plaintiffs, the poster remained up for about two days before another employee took it down and

24   brought it to plant management.  After Cooper pointed out the poster to Russell, Russell showed the

25   poster to the Vice President of Operations, Martha Christopher.  Spicer also testified that he saw the

26   poster.

27   223.  Ken Russell testified that in 1992 or 1993 he saw a swastika drawn in the entry

28

1   department of the plant.  Russell told President Wais about seeing the swastika.

2       224.  Supervisor Farris, who is not a plaintiff in this action testified that he saw a swastika on

3   a dumpster outside the plant, but he testified that he thought the dumpster did not belong to the

4   plant.  Plaintiffs note that Human Resource Manager Ramirez remembered a member of

5   management telling her of a swastika in the plant sometime before 1995.  She does not remember

6   there being an investigation into the graffiti.  Manager of Operations Barnett also remembered

7   hearing that a swastika had been on one of the company forklifts or trucks sometime after 1990.

8   Barnett testified that he was alarmed, and he talked to Ramirez, Moore, Brombacher, Williams, and

9   Lopez about his concerns.

10          **D.  Claims of Other Disparate Treatment**

11      225.  Russell testified that once he was cleaning up an oil spill for Supervisor Matthews

12  when Matthews came to check on him after two hours.  Russell testified that Matthews complained

13  that Russell was not working fast enough, even though Matthews had just walked by a white

14  employee who was asleep at the lunch table.  When Russell asked Matthews why he was "messing

15  with" him, Russell remembers Matthews, who is African American, saying that African American

16  workers had to work harder than white workers and that all African Americans had chips on their

17  shoulders.  Russell also remembers Matthews pointing to the only other two African American

18  employees in the room and saying, "That's why we can't get ahead with things like that."   This is a

19  generalized statement of opinion by Matthews not accompanied by instances of disparate treatment.

20      226.  Dexter Ballard testified that Frank Davis often treated African American employees

21  worse than other workers when the line would shut down.  Ballard testified that Davis would tell the

22  African American workers over the PA system how much money they were costing the company

23  when the line was down, but Ballard does not remember Davis saying the same things to white

24  workers when the line was down.

25      227.  Mustapha Cannon testified to a 1985 incident in which Supervisor Richard Dean would

26  watch him closely and criticize him for "standing around."  Cannon remembered that some white

27  employees were standing near him eating sunflower seeds, but Dean did not criticize them.  Cannon

28                                                      48

**United States District Court**
For the Northern District of California

1   felt that Dean continued watching him for the rest of his shift.  This incident is clearly outside the

2   liability period, involves a supervisor about whom no incidents within the period are alleged and

3   will not be considered for any purpose.

4   228.  Cannon testified that throughout the liability period, Supervisor Felciano would make

5   gestures to him through his office window, indicating Cannon was to get back to work.  Cannon did

6   not notice Felciano making the same gestures to white employees.  Defendants contend that Felciano

7   made the same gestures to all employees who he noticed standing around instead of working.

8   Cannon never complained to management that he found Felciano's gestures offensive.

9   229.  Cannon reported that Superintendent Bob Carey tried to get him to smile, asking him

10  repeatedly throughout the liability period after March of 1990.  Cannon remembers Carey telling

11  him that he was too intimidating for the other employees. Cannon testified that Carey would make

12  gestures to him indicating that he should smile more.  Cannon felt this treatment was humiliating

13  because Carey did not make such comments or gestures to white employees, even a white man who

14  was as large as Cannon.  He felt that Carey was stereotyping physically large African American

15  men.

16  230.  Cannon testified that in 1993, Supervisor Mark Hector removed him from his work

17  area and replaced him with a white employee when Hector was filming the packing of coils.

18  Defendants denied that the event took place and  questioned Cannon's credibility on this point.

19  Defendants testified that Hector filmed the plant in the late 1980s for a marketing and training video

20  and again in 1996 or 1997, after Cannon had left his position at the plant.  Defendants noted that the

21  film included employees of various races doing their jobs and that note Cannon was in some of the

22  photographs that Hector took of employees in the plant in the early 1990s.

23  231.  Lee Cooper testified that between 1992 and 1995, Cooper felt Supervisors Farris and

24  Davis treated him differently from other workers due to his race.  Cooper remembers that both

25  supervisors would tell him when to put coils on the line, even though Davis was not Cooper's

26  supervisor.  According to Cooper, these reminders were unnecessary and harassing because he had

27  been doing his job for a long time and no other supervisors had tried to tell him how to accomplish

28

United States District Court
For the Northern District of California

his tasks.  Cooper also felt that Farris and Davis did not make such comments to white employees.

232.  Defendants contend that Cooper tended to let the queue run out on the galvanizing line, threatening the ability of the plant to maintain continuous operation.  However, Farris and Davis conceded that there was no predetermined number of coils that needed to be on the line and that Farris could not remember whether Cooper had ever caused a problem on the line.  Defendants contend that Farris had spoken to all crane operators about keeping sufficient coils on the line. Defendants also note that when Ken Williams was Cooper's supervisor, he had needed to remind Cooper 3-4 times about keeping enough coils on the line.

233.  Around 1992, Cooper was standing with Russell while the line was down, waiting for it to start running again.  According to Cooper, Supervisor Farris approached him and said, "you are holding my man up from doing his job."  Cooper felt this was racially motivated treatment because he could see white workers also standing around the line and waiting and Farris did not approach any of them.

234.  Cooper testified that in approximately 1994, he and some other employees were returning to work a few minutes late from a break, and Supervisor Farris got upset with him and not with the white employees walking back with him.

235.  These recollections of Cooper are his impression of events.  However, they are not supported by facts showing specific comparables.  Furthermore, they did no result in any diminution of salary, position, or other benefits.

236.  In 1996, Peter Wais issued a General Announcement to the plant in which he accused class members in this action of exaggerating a handful of incidents in an effort to extort money from the company.

237.  Marcus Harper testified that while he worked at Pinole Point during the summer of 1992, he felt that Supervisor Brombacher assigned him to the more dangerous and dirty jobs. Harper was hired to perform clerical and office work, but Brombacher assigned him to jobs including climbing up the catwalk to count air filters and cleaning the basement.   Harper did not notice Brombacher give such assignments to white employees.

50

238.  Defendants countered that Harper was hired as a summer employee to run errands for Brombacher.  Brombacher assigned him to organizing files and loading and transporting accumulated brass and copper to a scrap dealer.

239.  Ken Russell testified that in 1989, Supervisor Bob Farris reprimanded him for leaving his work station without being relieved by another worker.  Russell claims that he did not leave his station early.  Russell believed Supervisor Davis was involved in the decision to give him a reprimand, and he interpreted the reprimand as racially motivated because he had never seen a white employee reprimanded in the same way.  Defendants proffered testimony of a company policy that employees are not to leave their stations until they have been relieved by another worker.  Russell was reprimanded for leaving early for the fourth time that year and that Russell never complained that the  reprimand was racially motivated.  The court notes that this event is outside the liability period.

240.  Russell and Cooper both testified that in 1992 they were standing in their work areas by the galvanizing line when it went down.  He testified that Supervisor Farris walked over to the two of them, passing by some white employees who were also standing at their work areas Farris started to yell at them for failing to go to the center section when the line shut down.   Farris admitted that he did not yell at any of the white employees for failing to report to the center section.

241.  Russell testified that he complained about the incident to President Wais.   Defendants maintain that Farris had called all the employees on the line to center station when the line had gone down.  After approximately twenty minutes during which Farris had twice called for Russell over the PA system, Farris found Russell in the locker room bathroom.  Defendants contend that Farris did not give Russell a written reprimand or yell at Russell.  Farris remembers other occasions when Russell had failed to report to center section as Farris had requested, but Russell had never received a reprimand for such conduct.  Defendants maintain that Farris has also reminded white employees to report to center section, including Chris Felciano, Ed Meyer and Greg Freeman.

242.  Russell testified that in 1991 or 1992, Supervisor Cary Felciano had a white employee work overtime on the job that Russell had been assigned.  Felciano testified that he had followed

51

company policy when he held the white employee for overtime work.  Pinole Point required that if an employee from a previous shift is already doing the work, a supervisor or foreman should just hold him over into the next shift to complete the job.

243.  Russell testified that instead of assigning him the overtime position Felciano sent him to sweep in the rain without rain gear.  Felciano testified that he knew it was his responsibility to provide Russell with rain gear but that he had been unaware that it was raining when he sent Russell outside to sweep.  Defendants also proffer that it was the employee's responsibility to get rain gear if it was needed.   Felciano also testified that he did not remember if he ever assigned another employee to sweep in the rain.

244.  Russell complained to Felciano and the EEOC that he felt this assignment was racially motivated.  There was no evidence that an investigation occurred in response to either complaint. Defendants also note that Russell did not complain to management that he felt his job assignment was racially motivated.  This event is *de minimis* and Russell did not suffer any diminution in salary, position or other benefits.

245.  Russell testified that in 1991 or 1992, Supervisor Jaeger gave him a written reprimand for being out of his work area.  Russell felt the write up was racially based because the white employees with whom he had been working had not received similar reprimands.  Jaeger admitted that he had not written anyone up before for being out of his or her work area.  Russell complained to Jaeger, Williams, Moore and Ramirez.  Ramirez's notes from the meeting indicate she was aware that he felt the treatment was racially motivated.  There was no evidence that Ramirez ever followed up on Russell's complaint.  Russell also filed an EEOC charge.

246.  Russell testified that in either 1992 or 1993, he felt he was being treated unfairly due to his race when Supervisor Farris sent him home as "absent without leave" when he was only five minutes late to work.  Russell did not feel that Farris punished white employees for the same infractions.  Russell complained about his feeling of racial harassment from Farris to President Wais. Defendants contested these facts asserting that Russell arrived twenty minutes late and that Farris assigned Russell to a shipping position for the day instead of his normal position.[16]  Farris was not

**United States District Court**
For the Northern District of California

1    required by company policy to find Russell alternate work.  Defendants contend that Russell refused

2    the shipping position and left the plant, but despite that, after Russell complained, Moore and

3    Ramirez paid him for the day and removed the discipline from his personnel file

4        247.  Russell testified that between 1993 and 1995 Supervisor Davis would yell at him in the

5    workplace.  Russell also remembered that Davis would yell at another African American employee,

6    Alfonso Murrie.  Russell did not remember hearing Davis yell at white employees.  Russell felt that

7    he received such bad treatment from Davis that on two or three occasions he voluntarily moved to a

8    lower position to avoid working with Davis.  Russell complained to Supervisor Moore about Davis,

9    but states Moore told him to "salute him and smile."

10       248.  Russell testified about an incident when his lab test showed that some product

11   specifications had not been met.  Supervisor Davis did the test again and his test showed that

12   specification had been met.  When Davis asked Russell to put Davis' results into his report, Russell

13   refused.  Russell remembers that Davis began to yell at him.  Russell testified that he felt Davis was

14   treating him differently from other employees because he was African American.  Plaintiffs do not

15   show specific instances of disparate treatment, but only generalized impressions.

16       249.  Defendants attack Russell's testimony and his overall credibility arguing that Russell's

17   sister worked at Pinole approximately one year before he was hired, and she never related any

18   feelings of racial tension at the plant.  Defendants also note that though Russell refused to name the

19   names of any Union workers during his deposition, he proceeded to name names during his  trial

20   testimony

21       250.  Jack Spicer testified that after July 1992, he noticed that white employees would sit

22   down and sleep when the galvanizing line was shut down or during changeovers.  Spicer felt they

23   were sleeping in plain view, but he never noticed a supervisor approaching one of them and

24   reprimanding them.  He fails, however, to provide greater detail in these allegations or show specific

25   comparisons.  Nor does he show that he complained of this conduct.   Defendants contend that

26   Supervisor Farris has never allowed white employees to sleep while on the job.

27   **CONCLUSIONS OF LAW**

28                                                      53

1  I. <u>**Applicable Statutes and Case Law**</u>

2      The jurisdiction of this court is invoked pursuant to 28 U.S.C. sections 1331, 1343 and its

3  supplemental jurisdiction pursuant to section 1367.  The federal claims are asserted pursuant to Title

4  VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e, et seq., and 42 U.S.C. section 1981.

5  The state law claims are brought pursuant to the California Fair Employment and Housing Act

6  ("FEHA"), codified at section 12940 of the California Government Code.

7      Title VII prohibits an employer from discriminating against any individual with respect to his

8  or her "compensation, terms, conditions, or privileges of employment, because of such individual's

9  race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Section 1981 (a) provides

10  that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State

11  and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and

12  proceedings for the security of persons and property as is enjoyed by white citizens ...."   Under

13  section 1981 a plaintiff may obtain redress for discrimination based on race including the type of

14  claims asserted in this action.  *Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir.1985), *as*

15  *amended*, 784 F.2d 1407 (9th Cir.1986).  California's FEHA contains provisions parallel to Title

16  VII, and even more explicitly, section 12940 (j)(1) specifically proscribes the harassment of

17  employees by reason of their membership in certain protected classes including race or color.

18      Each of these three statutes employs essentially the same standards for establishing the

19  existence of  harassment or, as it is commonly referred to, a hostile work environment.   In order to

20  establish a violation of race discrimination under Title VII, as well as section 1981, a plaintiff must

21  show intentional discrimination on account of race. *Id.*;  *Evans v. McKay*, 869 F.2d 1341, 1344 (9th

22  Cir.1989).  Analysis of an employment discrimination claim under section 1981 follows the same

23  legal principles as those applicable in a Title VII disparate treatment case.  *Fonseca v. Sysco Food*

24  *Services of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir.2004).

25      A claim under the FEHA follows the contours of Title VII law.  In *Aguilar v. Avis Rent A*

26  *Car System, Inc.*, 21 Cal.4th 121 (1999), *cert. denied*, 529 U.S. 1138 (2000), the California Supreme

27  Court held that Title VII cases may be considered in interpreting the FEHA; the Court then

28

United States District Court
For the Northern District of California

1   proceeded to apply federal law in that case.  Subsequently, California courts have continued to

2   adhere to this practice.  *See  Lyle v. Warner Bros. Television Productions*, 38 Cal.4th 264, 278

3   (2006); *Miller v. Dep't. of Corrections*, 36 Cal.4th 446, 462 (2005); *Rehmani v. Superior Court*, 204

4   Cal.App.4th 945 (2012).  In accordance with the state court's application of Title VII standards to

5   FEHA hostile work environment claims, federal courts entertaining FEHA claims have followed

6   suit.  *See, e.g.*, *Manatt v. Bank of America*, 339 F.3d 792, 797 (9th Cir.2003); *Leland v. City and

7   County of San Francisco*, 576 F.Supp.2d 1079 (N.D.Cal.2008).  Therefore, this court's analysis will

8   apply to all of the claims in this action unless otherwise indicated.

9       Federal claims for what are characterized as harassment or hostile work environment are

10  treated as disparate treatment claims and may be redressed under both Title VII and section 1981.

11  Violations under these statutes may occur even in the absence of an economic effect on the

12  employee when "the workplace is permeated with discriminatory intimidation, ridicule, and insult ...

13  that is sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create

14  an abusive working environment."  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986).  Where the

15  hostile environment is created by co-workers plaintiff must show that the harassment was: (1)

16  unwelcome; (2) based on a protected characteristic such as race; (3) sufficiently severe or pervasive

17  to affect the terms, conditions, or privileges of employment; and (4) that the employer knew or

18  should have known of the harassment and failed to take immediate and appropriate corrective action.

19  *See, e.g., Swinton v. Potomac Corp*., 270 F.3d 794 (9th Cir. 2001), *cert. denied*, 535 U.S. 1018

20  (2002).  Violations also may be established when a supervisor creates or allows the existence of a

21  racially hostile environment.  *Meritor*, 477 U.S. at 64.

22      A plaintiff may state a case for harassment against the employer under one of two theories:

23  vicarious liability or negligence. If the harasser is a co-worker, the plaintiff must prove that the

24  employer was negligent, i.e., that the employer knew or should have known of the harassment but

25  did not take adequate steps to address it. *Nichols v. Azteca Restaurant Enters*., *Inc.,* 256 F.3d 864,

26  875 (9th Cir.2001); *see also State Dept. of Health Services v. Superior Court*, 31 Cal.4th 1026, 1044

27  (2003)(applying reasoning of the United States Supreme Court in supervisor harassment cases under

28                                                  55

United States District Court
For the Northern District of California

1  Title VII to FEHA cases).

2      If the harasser is a supervisor, the employer may be held vicariously liable. *Nichols,* 256 F.3d

3  at 875; *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir.1991).   In order for a supervisor's conduct to be

4  imputed to the employer company the supervisor must possess "substantial authority and discretion

5  to make decisions concerning the terms of the harasser's or harassee's employment" or, if lacking

6  such authority, possess "an official or strong de facto duty to act as a conduit to management for

7  complaints about work conditions".  *Swinton v. Potomac Corp*., 270 F.3d at 804 (quoting *Brooks v.*

8  *City of San Mateo*, 229 F.3d 917, 925 (9th Cir.2000) and *Lamb v. Household Credit Servs*., 956

9  F.Supp. 1511, 1516-18 (N.D.Cal.1997)).

10      Whether the harassment is by a co-worker or a supervisor the touchstone of a racial

11  harassment claim is that  1) the plaintiff was subjected to verbal or physical conduct of a racial

12  nature; 2) the conduct was unwelcome; and 3) the conduct was sufficiently severe or pervasive to

13  alter the conditions of plaintiff's employment such that it created an abusive environment.  *See*

14  *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21-22 (1993); *Davis v. Team Elec. Co.*, 520 F.3d 1080

15  (9th Cir.2008); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir.2004).  Courts must

16  examine the totality of the circumstances to determine whether or not a hostile work environment

17  exists.  *Harris*, 510 U.S. at 23.  Factors that may be considered when assessing the circumstances of

18  a potential hostile work environment include: (1) the frequency of the harassing conduct; (2) the

19  severity of the harassing conduct; (3) whether the conduct is physically threatening or humiliating or

20  merely an offensive utterance; and (4) whether the conduct unreasonably interferes with an

21  employee's work performance. *Id*.  Furthermore, the *Harris* court held that "in order to be actionable

22  under the statute [Title VII]", a hostile environment must be both "objectively and subjectively

23  offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact

24  did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)(citing to its

25  decisions in *Harris* and *Meritor*); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752-

26  54 (1998)(companion case to *Faragher* also relying on *Harris* and *Meritor*).  The "objective

27  measure...is set by what a reasonable person would consider abusive".  *Davis v. Team Elec*., 520

28

United States District Court
For the Northern District of California

F.3d at 1095. The subjective measure is determined by whether the plaintiff himself perceived the environment to be abusive. *Harris*, 510 U.S. at 21-22. Both tests must be met.

"Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice to create a hostile or abusive work environment. *Faragher,* 524 U.S. at 788. Not every insult constitutes a hostile environment *McGinest v. GTE Service Corp*., 360 F.3d 1103, 1114-15 (9th Cir.2004), *cert. denied*, 552 U.S. 1180 (2008) (quoting *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir.2000)). Isolated instances of horseplay over a period of years ordinarily will not rise to the level of actionable harassment. *See Candelore v. Clark County Sanitation Dist*., 975 F.2d 585, 590 (9th Cir.1992). The incidents must be sufficient to constitute a change in the terms and conditions of the employment. They must be persistent and ongoing. Incidents that were sporadic or did not occur over a sustained period of time also do not rise to this level. *See, e.g., Nichols, 256 F.3d at 871; Davis*, 520 F.3d at 1096.

Another principle that guides the court in this inquiry is that "conduct that involves or is aimed at persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1144 (7thCir.1997) ("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff");[17] *Black v. Zaring Homes, Inc*., 104 F.3d 822, 826 (6th Cir.), *cert. denied*, 522 U.S. 865 (1997) (fact that most comments were not directed at plaintiff weakened her harassment claim). Thus, for example, the California Supreme court has held in the comparable context of sexual harassment that a hostile work environment claim by a plaintiff who was not subjected to offensive remarks or actions requires "an even higher showing" than a claim by one who had been sexually harassed without suffering tangible job detriment; such a plaintiff must "establish that the sexually harassing conduct permeated [her] direct work environment." *Lyle* v. *Warner Bros.*, 38 Cal.4th at 278.

Among the factors to be considered are whether the conduct or statements were directed at the complaining employee; whether they created a dangerous situation or endangered the complaining employee; whether they deprived the employee of promotion, advancement or pay; or

57

**United States District Court**
For the Northern District of California

whether they otherwise changed the terms and conditions of his employment.  The requisite level of severity cannot be the product of  "a mathematically precise test"; it "varies inversely with the pervasiveness or frequency of the conduct".  *Davis v. Team Elec. Co.*, 520 F.3d at 1095-96 (quoting *Harris*, 510 U.S. at 22); *see also Nichols v. Azteca Rest. Enters., Inc*., 256 F.3d at 872.

On the other hand, a plaintiff need not establish that he suffered any "tangible employment action" such as demotion, diminution in salary or benefits, or other adverse action.  It is sufficient that plaintiff establish pervasive conduct permeating the workplace rendering it an abusive environment.  If, however, the claim rests upon the conduct of a supervisor who has "immediate (or successively higher) authority" over the plaintiff, and there was no "tangible employment action", an employer may assert an affirmative defense of "reasonable care".  *Davis,* 520 F.3d at 1096-97.  The employer carries the burden of establishing the affirmative defense by a preponderance of the evidence and must show that 1)it exercised reasonable care to prevent and correct promptly any harassing conduct and that 2) plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*.; *see also Craig v. M & O Agencies, Inc*., 496 F.3d 1047, 1055 (9th Cir. 2007).

These same standards apply to section 1981 and FEHA claims.  Facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim.  *Lowe*, 775 F.2d at 1010.  In *Aguilar* the California Supreme Court reiterated and applied the *Harris* and *Faragher* standards  to FEHA claims.  *See Aguilar v. Avis*, 21 Cal.4th at 130.

## II.  **The Inquiry and Summary**

The findings of fact section of this Memorandum and Order describe a litany of statements, comments, incidents and acts that are offensive.  Taking instruction from the foregoing case law, the court must scrutinize these facts using the following as guidance:

1) the dates of occurrence, i.e., did they occur within the liability period?

2) in whose presence the acts occurred, i.e., did they occur in the presence of the plaintiff or witnesses?

3) the period in which they occurred, i.e., were they isolated or pervasive, over an extended

period of time or within a discreet period?

4) the substance of the words or acts, i.e., was the language or conduct severe, serious, physically threatening or humiliating, or merely offensive?

5) the affect of the words or conduct, i.e., did it interfere with the employees' work performance?

In addition, the court must determine whether the words and incidents were the subject of complaints to management or otherwise known to management and, if so, what action management took in response to the complaints.

Keeping the foregoing considerations in mind, the court finds that some of the acts, such as those related to the cantaloupes, occurred outside the liability periods.   Some of the acts were not complained of or did not occur in the presence, or to the awareness, of supervisors with management authority as defined above.   Some acts were experienced by only one or a few of the plaintiffs or witnesses and not witnessed or testified to by others.   Some incidents did not affect job assignments or other terms and conditions of employment or did not result in loss of income or only a *de minimis* loss.  Evidence also shows that in some instances there were legitimate non-discriminatory reasons for an assignment or an adverse action.   No plaintiff or other employee  was physically threatened. Nor is there evidence that any statements or conduct interfered with any plaintiff's or employee's work performance.

**A.  Marwais**

Specifically and summarizing the findings above, at Marwais the presence of nooses was isolated and they were seen by only one or a few.   Usually they were removed shortly after they appeared.   In a couple of cases the ropes appeared not to be nooses nor were they intended to be nooses.  Ropes were regularly used for legitimate purposes at the facility.   The presence of dolls at the workplace was sporadic and seen only once or twice by different plaintiffs or witnesses before they were taken down.   Drawing and postings of offensive material were testified to in general terms and the testimony lacked specificity as to the incidents.   In other cases the time frame was not established and some of the incidents were clearly outside the liability period, or the time period was

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

not proven.  This is also true of the occasional graffiti, including the drawing of swastikas.  The single incident of the drawing of a black pig was not shown to be within the liability period.

The Jesse Jackson job application discussed at paragraphs 78-82 was a one-time incident which was investigated and resulted in meeting with employees and publication of a management memo instructing the need to be sensitive about such workplace conduct.  In this and many other instances discipline of an offending employee was not meted out because the culprit was unknown.

Another specific incident of a racially offensive drawing involved a picture in a co-worker's office.  See ¶ 66, Findings of Fact.  A complaint was made and some supervisors saw the picture.  However, this was one picture; it was in a co-employee's office; and it was an isolated incident.

Testimony about verbal statements was often general and conclusory.  Again, some of the statements occurred outside the liability period.  The statements, to the extent they were specified, were made by co-workers and occasionally in the presence of a supervisor.  The statements were directed at or about a specific individual, were sporadic and not over a sustained period of time.  The most frequently used was the term "Buckwheat" was directed by one co-worker to another.  There was the infrequent, albeit deplorable, use of the word "nigger" by one co-worker toward another co-worker.  With all of the comments and incidents described above some were not reported or heard in the presence of supervisors.   They were sporadic and not sustained or persistent over a period of time.

Disparate treatment conduct such as job assignments and disciplinary or other adverse actions were complained of and testified to by Adams, Clay and Jones.  Clay and Jones particularly complained of and testified to actions by former supervisor Bunker.  They related complaints of assignments which they believed were discriminatory in that white employees were not similarly assigned.  However, their testimony was very impressionistic and reflected their beliefs.  It was not supported by any data or other reliable bases for comparing with similarly situated employees who were not African American.  In addition, the court is persuaded by the evidence that there were legitimate concerns about Clay's competency to handle other assignments.

Adams' complaints related only to himself, his assignments and reprimands or adverse action

United States District Court
For the Northern District of California

he received.  The court is persuaded by the evidence that defendants had legitimate, non-

discriminatory reasons for the assignments and actions taken.  The evidence establishes that Adams

was an employee of limited skills compared to many other employees of his and other races.  This

resulted in assignments different from those given to more highly skilled employees who were

African American, white or Hispanic.  Furthermore, any consequence of supervisory actions of a

disciplinary or adverse nature were justified by Adams' work or were *de minimis*.

### B. Pinole Point

The testimony with respect to Pinole Point  identified several incidents of nooses or dolls at

the facility.  Seven plaintiffs or employees testified to seeing a noose or doll on occasion.  Usually

the item was present only for one or two days before it was taken down.  One such sighting was over

the period of one week before the doll was removed.  One occasion was not established to be within

the liability period.  Most of the sightings were attested to by only one person.   It is not clear from

the evidence whether the witnesses were identifying the same objects or different ones.  In most of

the cases the sightings were not reported to management.  In the case of the doll inside a microwave,

the incident was isolated, reported and no investigation was conducted.

The evidence also established that some, but not all, of the ropes sighted were not nooses,

and had a legitimate workplace purpose.  It was also undisputed that dolls, black and white, were

frequently found at the workplace.  These facts, however, do not justify the presence of ropes

intended to be viewed as "nooses" or the presence of dolls painted black.  Nonetheless, the

frequency of these offensive objects was sporadic and not over a sustained period of time.  And,

most of the objects were seen only by employees and not reported to management.

Offensive written or verbal statements at Pinole Point consisted of use of the word "nigger"

(heard three to four times during the liability period), "jigaboo" (heard once). "Sammy"(directed at

one employee, not reported and resulting in a reprimand by a supervisor at an employee meeting).

Offensive drawings consisted of swastikas which were testified to by two witnesses.  In one case it

was on a dumpster of uncertain ownership on Pinole Point premises, one witness testifying that he

believed it did not belong to the defendants.  Other drawings were in the pre-liability period or the

61

subject of hearsay testimony only. Another drawing was posted for two days before it was removed.

Where the offensive language was written it was removed shortly after it was first espied and generally no complaints or reports were made. The NAACP comment, at paragraphs 10 and 209 of the findings, was a one time incident with respect to one employee. In another case testified to by employee Spicer the comments were not directed at him. While the offensiveness of the language discussed herein should not be minimized, it does not rise to the level of sustained, pervasive or repeated conduct so as to be abusive or actionable within the standards of existing case law. It was sporadic, of short duration, and often unknown or not reported to management, and occasionally outside the liability period.

There was some testimony about disparate treatment at the Pinole Point facility. However, much of it was impressionistic, reflecting general belief of discriminatory assignments or treatment, not supported by details or factual comparisons with non-minority employees. Others were mere statements about whether an employee, Cannon, worked hard enough. In one case there were comments by an African American supervisor about his view of expectations for African American employees. This reflected his own perceptions and not the views of defendants. Furthermore, no actionable or compensable adverse actions were taken by defendants.

### C.  Conclusion

Based on the foregoing, the court finds that as to both Marwais and Pinole Point plaintiffs have failed to establish that within the liability period the derogatory conduct and statements testified to were so pervasive, ongoing or persistent as to create a hostile work environment or interfere with the work performance of plaintiffs or other African American employees. While the conduct and statements may have been perceived as abusive by the plaintiffs, they do not meet the objective measure of what a reasonable person would consider abusive as defined by existing case law.

### D.  Addendum re Class Certification

In this court's May 18, 1994 order the court found the employment policies and practices at the Marwais and Pinole Point facilities were sufficiently the same or similar to justify treating them

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

as one entity for the purposes of class certification.  The court also certified a class of African American employees subject to a racially hostile work environment.  In certifying this class the court noted that "[h]ostile workplace conduct is not as discrete as defendants suggest.  It may be pervasive and stem from terms and conditions that fall unfairly and repeatedly on the shoulders of protected class members." Mem. and Order, Dkt. No. 137, at p.18.  The court further noted that its holding did not affect "individual claims of class members."  Id. at n.3.  Finally, the court retained the right to alter or amend the class certification order or take other appropriate action during the course of the litigation.

It is obvious from the court's post-trial holding in these findings and conclusions that the complained of conduct was not pervasive and was, in fact, more discrete than contended by plaintiffs.  In retrospect the evidence at trial shows that the conduct was not observed by or directed at all class members.  It was not pervasive, ongoing or persistent such that it permeated the workplace.  Unlike the overall policies and practices in hiring, promotion and other employment actions that governed both workplaces, the environment and whether it was a hostile one was different at each facility.   While there were a few employees and supervisors that had worked at both facilities, that was not true of most of them.  While the incidents complained of at each bore some similarities, they were distinct, witnessed by different employees and treated on a case-by-case basis.  They cannot be accumulated to create one hostile environment.  It is also clear that each incident within each facility was witnessed only by one or a few people and not witnessed, directed at or felt by every or most of the members of the class at that facility.  Thus, after hearing all of the evidence in the case the court finds that these claims are not susceptible of class treatment.  There is a lack of commonality and typicality.  There is even a question of whether there is sufficient numerosity to qualify for class treatment.

Another difficulty in treating these claims as class claims is the requirement of showing that the environment is subjectively hostile, an inquiry which is necessarily particular to each class member.  Finally, well before the Supreme Court's most recent foray into employment class actions in *Wal-Mart Stores, Inc. v. Dukes*, ___U.S.___, 131 S.Ct. 2541 (2011), the Court had made clear

that "[c]ommonality requires the plaintiff demonstrate that the class members 'have suffered the same injury'". *Id*. at 2551 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)).

This is not a case where all class members attended the same seminars, received the same e-mail or heard the same speech. *See, e.g., Markham v. White*, 171 F.R.D. 217 (N.D.Ill.1997); *Newsome v. Up-to-Date Laundry, Inc*., 219 F.R.D. 356 (D.Md.2004). For these reasons and the reasons set forth in these findings and conclusions, plaintiffs cannot show common questions or typicality under Federal Rule of Civil Procedure 23(b)(2) let alone reach the issue of whether common questions "predominate" under 23(b)(3) and meet the more rigorous tests of *Wal-Mart*.

Finally, given the court's post-trial ruling on the merits, the class certification issues essentially are mooted.

Accordingly, judgment will be entered in favor of defendants.

IT IS SO ORDERED.

Dated:   September 26, 2012   _____

MARILYN HALL PATEL
United States District Court Judge

United States District Court
For the Northern District of California

64

**ENDNOTES**

1. Terry Bunker's testimony was stricken from the record in March 1997. Defendants failed to include him on their witness list in a timely manner. Superintendent Anderson's testimony regarding conversations he had with Bunker was admitted for notice only.

2. The testimony indicates that the Union withdrew all but one of Adams' grievances after Step 2 or 3 of the grievance process and that the remaining grievance was denied.

3. Plaintiffs contend that Anderson related that many of the Hispanic employees at his previous place of employment "would go outside and take a crap just anywhere," and he explained that "that's how those people are." Defendants do not deny that Anderson made such comments about Hispanic people. Defendants contend that Anderson testified that employees would go outside to go to the bathroom because the facilities at his old place of employment were in disrepair. According to Anderson, this story was told during a Marwais meeting on the importance of hygiene, and the important aspect of the story was that Anderson solved the problem by having a portable toilet brought to the plant. Defendants also contend that Anderson told the story to communicate that everyone should treat people with respect, even if they act in different ways.

Plaintiffs contend that Anderson impeached himself because he gave two conflicting explanations for the story he told at the safety meeting. Plaintiffs contend that Anderson testified at trial that he related the story in response to an employee's question about plant hygiene. According to plaintiffs, he testified that he explained to the meeting attendees that the employees at his previous job went to the bathroom outside to avoid broken bathrooms until Anderson devised a solution and had portable toilets brought to the plant. In his cross-examination, plaintiffs contend that Anderson admitted that he gave a different account of the incident in his deposition. There, he testified that he was discussing "how different people did things different ways which might be upsetting to others," and he used the Hispanic employees at his previous job as an example. Defendants do not address Anderson's credibility. They imply that Anderson's testimony is not inconsistent.

Anderson testified that Supervisor Bunker told him some employees were offended by his story, and he testified that he told Bunker to relate his justification for the story to those employees or, if they were still unsatisfied, Anderson would meet with them

4. As noted above, Bunker did not testify at trial.

5. Defendants' contentions regarding interactions between Supervisor Bunker and Robert Adams are based on Superintendent Anderson's recollections of conversations with Supervisor Bunker. As noted previously, Anderson's testimony about Bunker was admitted for notice only.

6. The Court interprets Superintendent Anderson's testimony to indicate that Anderson believed Adams admitted to Supervisor Bunker, not Anderson, that he had been doing personal work on company time. At trial, when Anderson was asked whether he approved Adams' reprimand, Anderson testified "Yes, I did, because he admitted he was doing personal work on company time." He continued: "unauthorized personal work on company time. That was Robert's words. He admitted it." Though this testimony is somewhat unclear, it was given in the course of testimony concerning Bunker's report to Anderson. In addition, Anderson indicated at trial that he did not personally conduct any investigation into the incident.

7. Anderson testified that he reduced the discipline to ensure that the workplace would continue operating smoothly, not because the discipline was unwarranted. Plaintiffs contend that Anderson was impeached by his deposition testimony, in which plaintiffs contend he stated that he did not believe Marwais management had ever compromised on discipline when management believed the discipline

65

United States District Court
For the Northern District of California

justified.

8.  In 1992, he stopped taking notes about what was happening at Marwais, believing the company was "cleaning up its act."

9.  The veracity of Jefferson's complaints is undermined by Jefferson's choice to leave a job at another employer and return to Marwais in January 1994 despite his grievances of alleged racial discrimination or harassment.

10.  Defendants also note that Russell did not mention a doll such as Cannon described when he testified about dolls and nooses at the plant.  Defendants also mistakenly claim that Cooper did not testify at trial.  However, he did testify, and he indicated during his testimony that he saw a noose while he was in the company of Cannon and Russell.  While Cooper's testimony is similar to Cannon's testimony, their stories are not perfectly consistent.

11.  Defendants mistakenly contend that Cooper did not testify at trial.

12.  The joke involved a drawing of "the last thing a black man sees while he's going down the well" and was meant to represent two members of the KKK peering down the well.

13.  Nor does the fact that Cannon continued to drive to work occasionally with Wade, even after Wade told the offensive jokes vitiate the offensive nature of the jokes.

14.  Cannon testified that Walker used the term about seven to ten times per shift over a couple of months in the summer.

15.  Harper also testified that Brombacher often called him "stupid" or accused him of lying or stealing while he was working, and Harper felt these accusations were based on a stereotype of young African American men.  However, the court does not find evidence that these comments were evidence of race-based animus.

16.  Defendants also presented testimony that employees are considered late even if they arrive at the plant one minute behind schedule because the machinery in the plant runs continuously.

17.  The Seventh Circuit recently cited *Gleason* approvingly in discussing the distinction beween being the "target" of offensive words or conduct and being within the "target area".  *Yukins v. First Student, Inc.*, 481 F.3d 552 (7th Cir.2007).  To the extent this is a variance or gloss on *Gleason* it does not change the analysis here.